[S.F. No. 23020. In Bank. Mar. 12, 1974.]

MARY KATHERINE WHITFIELD, a Minor, etc.,
Plaintiff and Appellant, v.
ARTHUR ROTH et al.,
Defendants and Respondents.

## COUNSEL

Gonick, Schmid & Bernstein, Harry Gonick, Goldstein, Barceloux & Goldstein, P. M. Barceloux, Burton J. Goldstein, Albert E. Levy, Ralph Golub and M. Reed Hunter for Plaintiff and Appellant.

Fadem & Kanner and Gideon Kanner as Amici Curiae on behalf of Plaintiff and Appellant.

Burnhill, Rode, Moffitt & Moore, Burnhill, Morehouse & Burford, Mc-Namara, Lewis & Craddick, Cyril Viadro, Crosby, Heafey, Roach & May, Edwin A. Heafey, Jr., Raoul D. Kennedy and Peter W. Davis for Defendants and Respondents.

Evelle J. Younger, Attorney General, James E. Sabine, Assistant Attorney General, Leonard M. Sperry, Jr., Deputy Attorney General, Harry S. Fenton, Robert F. Carlson and Kenneth G. Nellis as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

SULLIVAN, J.—In this action for damages for medical malpractice, plaintiff appeals from a judgment of nonsuit entered in favor of defendant County of Contra Costa (County) and Glenn S. Skinner, M.D., and from a judgment entered on a jury verdict in favor of all the then remaining defendants. We discuss the appeals separately.

### I

### *Appeal from Judgment of Nonsuit*

Viewing the evidence under the well-settled rules governing nonsuits,[1] we set forth the following pertinent facts.

In November 1961, shortly after moving from Oregon and enrolling in the Oakland public schools, plaintiff Mary Katherine Whitfield, then 10 years old, was examined by Dr. Philip Chamberlain, the school pediatrician. He found her to be an extremely thin, cachectic[2] child who appeared to have been neglected for several months.[3] Disturbed by Mary's condition, he had her admitted to Children's Hospital of the East Bay, where she remained until December 1, 1961.

---

[1]See *Stanford* v. *City of Ontario* (1972) 6 Cal.3d 870, 874, fn. 1 [101 Cal.Rptr. 97, 495 P.2d 425], and cases there cited.

[2]"Cachexia: A condition of general ill health with malnutrition and wasting of the body, due to some chronic constitutional affection . . . ." (Webster's Unabridged New Internat. Dict. (2d ed. 1959).)

[3]He stated in his report of the examination: "This child is cachectic, has lost 30 pounds in the past three to four months. Mother has noticed no other symptoms but not really too observant. Has not attempted to seek medical attention for this girl. . . . Best bet now would be intracranial neoplasm. Should have immediate admission to H.A.C.H."

The doctor testified that: "An intracranial neoplasm means a tumor, either benign or malignant, within the cranial cavity."

On the day following her admission, Dr. Carrell A. Peterson, a radiologist at the hospital[4] X-rayed Mary to determine whether there was a tumor. After studying the X-ray films of Mary's skull, he concluded that they showed neither a tumor nor any other kind of abnormality. Indeed all tests conducted at the hospital failed to demonstrate any organic cause for Mary's extreme malnutrition. The staff at Children's Hospital finally diagnosed Mary's condition as anorexia nervosa, a psychiatric condition.[5]

Mary was then sent home with the understanding that she would continue to receive treatment at the hospital as an outpatient on a long-term basis. This program included prescription of vitamin and hormone pills and continued consultation with defendant Dr. Kent A. Zimmerman, the staff psychiatrist. A concomitant of this program was intensive care at home. The hospital staff expressed concern that Mary's mother, Peggy Whitfield Chandler, would not provide the requisite home care for a number of reasons pertaining to her behavior and her attitude toward Mary's condition. Mary failed to keep many appointments and by February 1962 had stopped coming to the hospital altogether.

About eight months later Dr. Joel Levine discovered Mary late at night in the locked and unlighted outpatient clinic of the Presbyterian Medical Center. He treated her for a monkey bite. On her return two days later he attempted to ascertain the cause of her emaciated condition. Unable to discover any organic cause, he referred her to the hospital's psychiatric clinic for treatment in accordance with a diagnosis of anorexia nervosa. However, Mary's mother refused to cooperate.

Nearly a year later, Mary visited defendant Dr. Clifford L. Feiler for an earache and a respiratory condition. He also was concerned about Mary's condition and urged her mother to have Mary tested exhaustively. Her mother continued to be uncooperative. Three months later, on September 19, 1963, Mrs. Chandler took Mary to defendant Dr. David Johnson, a pediatrician, for a physical check-up, because she thought Mary had leukemia. Dr. Johnson concluded that Mary did not have leukemia, but noting among other things her emaciated condition, recommended a series of tests. His recommendations were not accepted.

On October 2, 1963, Mary was admitted to Contra Costa County Hospital (County Hospital) for a diagnostic work-up. She was examined by Dr. Skinner, who initially concluded Mary might be suffering from leukemia,

[4]Dr. Peterson and his partners Drs. Arbuckle, Attwood, Merrill and Reid, all defendants herein, were radiologists at the hospital.

[5]Schmidt's Attorneys Dictionary of Medicine defines "anorexia nervosa" as "A loss or severe diminution of the appetite, due to hysteria or nervousness, resulting in a serious loss of weight and in a debilitating (incapacitating) malnutrition."

metabolic disorder or brain tumor. In his initial examination, Dr. Skinner ruled out both leukemia and thyroid disease as a cause of the metabolic disorder. On October 3, Mary was examined by Dr. Hart, a pediatrician, who ordered a psychiatric consultation on the basis of the examination, further confirmed by information from Children's Hospital that her condition had been diagnosed there as anorexia nervosa.

On October 4, Mary was examined by Dr. Cramer, a psychiatric consultant to the County Hospital. Based upon his examination of Mary, Dr. Cramer felt that organic brain disease—specifically craniopharyngioma—was the most likely possibility, and suggested that a series of tests be conducted including a skull X-ray, electroencephalogram, "psychologicals," a neurological examination and a visual fields test. Dr. Cramer was led to suspect craniopharyngioma because he had run across an almost identical case during his residency. Unfortunately, none of the other staff members appreciated the significance of his diagnosis and most of the tests were not performed. Dr. Hart thought Dr. Cramer's suggestion of craniopharyngioma an unusually specific diagnosis, but "[m]y interpretation was that he was really rather winging it." Neither Dr. Hart nor Dr. Skinner had ever witnessed or treated a case of craniopharyngioma; both thought there was a possibility of brain tumor.

While she was in the hospital, Mary was very unhappy, given to repeated crying spells and unable to gain weight. Because of this condition she was discharged from the hospital on October 11, 1963. On that date, Dr. Skinner wrote the following note on Mary's chart. "All consultations are in now. No definite diagnosis. Dr. Colony suggests arachnodactaly. Will discharge to Pediatrics Clinic for followup." On October 15, 1963, Dr. Lee of the County Hospital telephoned Dr. Johnson and informed him that "He and the staff at Contra Costa Hospital have come to the same conclusion independently that the primary problem is psychiatric anorexia nervosa and that there is no evidence in the studies performed to indicate organic disease. . . . [Mother] has of her own accord continued to tell people that Mary has leukemia." On the same day Dr. Lee noted that he had told Mary's mother that Mary has no sign of leukemia or any malignant disease. Dr. Lee did not mention that the staff doctors considered the diagnosis incomplete, that there was an impression that a brain tumor was possible, or that tests to determine the existence of this tumor had not yet been completed. Upon Mary's discharge from County Hospital, notwithstanding the conclusion of the staff,[6] her chart contained the following notation entered by Dr. Skinner: "Final diagnosis: anorexia nervosa."

---

[6]The staff concluded: "She [Mary] had been seen by the psychiatrist, Dr. Cramer, the neurologist, Dr. Colony, and myself, and probably two other staff pediatricians,

Eleven days later, on October 22, 1963, Mary was readmitted to Children's Hospital. Dr. Sheaff, the admitting doctor, made a report as set forth in the margin.[7] However, the hospital made no contact with any of the doctors or hospitals who had examined Mary since her discharge from Children's Hospital two years earlier. Dr. Browning, who was in charge of Mary's case during this period of hospitalization, concluded that the original diagnosis of anorexia nervosa had been and was still correct. Upon Mary's discharge on October 31, 1963, Dr. Browning and Mrs. Simonds, a social worker, tried hard to convince Mrs. Chandler that Mary's real problem was psychiatric and that she needed long-term treatment on an outpatient basis.

Within a month, on November 25, 1963, Mary commenced treatment with defendant Dr. Arthur Roth, a pediatrician with a psychotherapeutic background. Dr. Roth neither saw, nor indeed requested, any of the medical or hospital records chronicling Mary's long history. Instead he telephoned Dr. Browning at Children's Hospital and Dr. Johnson, and obtained their summarized version of the medical history, namely that there was neither leukemia nor any organic disease and that the diagnosis was anorexia nervosa. Dr. Roth concurred in this diagnosis and accordingly provided Mary psychotherapeutic treatment. His treatment had quite startling success: by May 1, 1964, Mary's weight increased from 50 to 69 pounds.

However, during April, May, and increasingly in June 1964, Mary's concomitant symptoms of headache, vomiting and eye trouble, recurred and intensified. Dr. Roth, concerned about Mary's headache and eye problems, sent her to Dr. Allington, an ophthalmologist. When Dr. Roth learned on June 22, 1964, that Mary was seeing double, he wrote Mrs. Chandler informing her that Dr. Allington had not completed his examination of Mary's eyes and prescribed some pills for the vomiting. Two days later Mrs. Chandler informed him that Mary was suffering from a stiff neck and backache as well as continued vomiting. Believing that she needed immediate attention, Dr. Roth sent Mary to Highland Hospital. There, defendant Dr. Rich-

---

as well as Dr. Skinner, and we didn't know what was the matter with this child. Our working diagnosis at the time of discharge, or at least my working diagnosis at the time of discharge, was anorexia nervosa, but we had not carried out all the recommendations made by the other consultants at that point . . . ."

[7] "Mother not reliable and definitely does not have a grasp of the situation. CHIEF COMPLAINT: Deterioration in condition 6 months. . . . was here in 1961 with anorexia nervosa. . . . Mother is completely unaware of the child's basic problem. . . . For the past year or so she has had no psychiatric follow-up. . . . This is an overwhelming problem with both parties. This admission should serve as a move to reorganize and perhaps identify the problem to the mother."

ard L. Wacht, after taking a spinal tap concluded that Mary was not acutely ill and discharged her. Mrs. Chandler became incensed.

Two or three days later, Mary came under the care of another pediatrician, defendant Dr. Stanley Fischer, who sent her to Providence Hospital for a skull X-ray. On July 3, 1964, Dr. Bunche examined that X-ray and concluded that Mary had a craniopharyngioma, a type of brain tumor. On July 7, 1964, Mary was admitted for the third time, to Children's Hospital where the diagnosis of a craniopharyngioma was confirmed. On July 10, Dr. Wyand surgically removed the tumor.

Although her post-operative recovery was at first normal, suddenly on July 22, she suffered a stroke. As a result she became totally paralyzed in both legs and in her right arm. She could use her left hand and arm but was unable to feed herself or change her position in bed. She could barely speak and communicated poorly through gestures. She required permanent hospitalization. There was evidence at the time of trial that she had a life expectancy of 20 years.

Mrs. Chandler believing that there may have been some malpractice on the part of one or more of the various doctors and hospitals, attempted to obtain counsel for the purpose of securing redress for Mary. Unsuccessful at first, on February 9, 1965, she finally retained attorney Harry Gonick.

On March 24, 1965, plaintiffs, represented by Mr. Gonick brought the instant action asserting liability against the various doctors and hospitals who had examined or treated Mary, except defendant County of Contra Costa as operator of the County Hospital but including nevertheless defendant Dr. Skinner. The complaint set forth two separately stated causes of action: the first by Mary by Mrs. Chandler as guardian ad litem for general and special damages and the second by Mrs. Chandler, individually, for past and future medical and hospital expenses.[8]

On June 16, 1965, plaintiffs filed a first amended complaint as of course. On October 19, 1965, pursuant to discovery proceedings plaintiffs obtained Mary's records at the County Hospital and discovered for the first time that Dr. Cramer had tentatively diagnosed a craniopharyngioma and had recommended a series of tests in order to determine whether there was a craniopharyngioma, that those tests had not been performed, that Dr. Skinner also had thought a brain tumor possible, that none of this had been revealed to Mrs. Chandler, and that the County Hospital had positively represented the absence of any organic disease.

---

[8]The original complaint, manifestly exploratory, alleged that plaintiffs were not certain as to which defendants were negligent and had therefore joined all so that their liability "may be determined among them."

On November 19, 1965, plaintiffs presented to defendant County their claim in the sum of $1,020,000. (Gov. Code, §§ 911.2, 915.) It was denied four days later. They did not apply to the County for leave to file a late claim. (Gov. Code, § 911.4.) On January 28, 1966, plaintiffs filed a second amended complaint adding the County as a defendant, asserting particular charges of liability against certain defendants[9] and reiterating their original position as to the remaining defendants that they had been joined so that it could be determined to what, if any extent, any or all of them were liable. (See fn. 8, *ante*.)

The first cause of action by Mary alleged that the facts asserting liability against the County and its employees "were concealed from and not discovered by the plaintiffs until after October 19, 1965, when the records of Contra Costa County Hospital were made available to plaintiffs' attorneys under a subpoena duces tecum. That, by virtue of such concealment, plaintiffs' causes of action did not come into existence until such discovery, under Section 901 of the Government Code; that within 100 days after the accrual of said causes of action, to wit: On November 19, 1965, a claim was duly presented to the County of Contra Costa, in accordance with the applicable provisions of the Government Code, and said claim was thereafter denied on November 23, 1965."

The second cause of action, by Mrs. Chandler individually, incorporated by reference the above and other allegations, alleged that the facts asserting liability against the County and Dr. Skinner were concealed and not discovered by this plaintiff until after October 19, 1965, when the medical records at the County Hospital were made available, and further alleged that the facts constituting her cause of action against the defendant radiologists were concealed from her by them and not discovered until November 19, 1965, after a reexamination of X-rays taken at Children's Hospital in 1961, and further that as to the remaining defendants she did not discover the facts constituting her cause of action until July 5, 1964,[10] "when the said ill effects of their negligence and lack of skill manifested themselves."

---

[9]It was alleged in essence that Children's Hospital of the East Bay was negligent in its X-ray examination; and that the County Hospital and Dr. Skinner failed to test for brain tumor despite a diagnosis of its possible existence, failed to disclose this diagnosis and misrepresented that there was no organic disease.

[10]In the original complaint which named Dr. Skinner but not the County as defendant, the first cause of action by Mary contained no allegations as to the discovery of the facts giving rise to the cause of action whereas the second cause of action by Mrs. Chandler alleged concealment "from this family" by defendants and that "said facts were not discovered by her until on or about July 15, 1964, when the said ill effects of said negligence and lack of skill manifested themselves."

At the commencement of the trial on February 24, 1969, plaintiff Peggy Whitfield Chandler dismissed the second cause of action brought by her individually and thereafter the case proceeded to trial with Mary Whitfield as the sole plaintiff. At. the conclusion of said plaintiff's case in chief, the County and Dr. Skinner moved for a nonsuit on the ground that Mary had failed to present a timely claim against the County. The court granted their motion and entered judgment accordingly. As previously noted, Mary has appealed from such judgment.

The question confronting us on this appeal is whether, under the rules governing nonsuit, there is sufficient evidence in the record to support a finding that plaintiff's claim against defendant County was timely filed. We begin with the basic requirement of the California Tort Claims Act that a claim against a public entity for damages for personal injuries must be presented to it in writing not later than the 100th day after the accrual of the cause of action on which the claim is based. (Gov. Code, § 911.2.)[11] Presentation and rejection of such a claim are conditions precedent to the commencement of suit against the public entity on the cause of action for which the claim is required. (§ 945.4.)[12]

These claims provisions apply to minors. (*Artukovich* v. *Astendorf* (1942) 21 Cal.2d 329 [131 P.2d 831]; *Wozniak* v. *Peninsula Hospital* (1969) 1 Cal.App.3d 716, 723 [82 Cal.Rptr. 84]; see *Williams* v. *Los Angeles Metropolitan Transit Authority* (1968) 68 Cal.2d 599 [68 Cal. Rptr. 297, 440 P.2d 497]; *Tammen* v. *County of San Diego* (1967) 66 Cal.2d 468, 479-480 [58 Cal.Rptr. 249, 426 P.2d 753].) Indeed they apply with greater liberality to minors, since under the provisions of sec-

[11]Government Code section 911.2 provides in pertinent part: "A claim relating to a cause of action for death or for injury to person . . . shall be presented as provided in Article 2 (commencing with Section 915) of this chapter not later than the 100th day after the accrual of the cause of action."

Hereafter, unless otherwise indicated, all section references are to the Government Code.

[12]Section 945.4 provides: "Except as provided in Section 946.4 and 946.6, no suit for money or damages may be brought against a public entity on a cause of action for which a claim is required to be presented in accordance with Chapter 1 (commencing with Section 900) and Chapter 2 (commencing with Section 910) of Part 3 of this division until a written claim therefor has been presented to the public entity and has been acted upon by the board, or has been deemed to have been rejected by the board, in accordance with Chapters 1 and 2 of Part 3 of this division."

tion 911.4[13] and section 911.6,[14] an application for leave to present a late claim made by a claimant who has been a minor throughout the entire 100-day claim presentation period *must* be granted by the board.[15] (*Tammen* v. *County of San Diego, supra,* 66 Cal.2d 468, 479-480; *Hom* v. *Chico Unified Sch. Dist.* (1967) 254 Cal.App.2d 335, 338-339 [61 Cal. Rptr. 920].)[16]

It is necessary, therefore, first to consider what is meant by the phrase "accrual of the cause of action on which the claim is based" which event by virtue of the provisions of section 911.2 starts the running of the 100-day claim presentation period and, secondly, to determine whether Mary presented her claim within such period.

Section 901 provides that for the purpose of computing the above time limit prescribed by section 911.2 "the date of the accrual of a cause of ac-

[13]Section 911.4 provides: "(a) When a claim that is required by Section 911.2 to be presented not later than the 100th day after the accrual of the cause of action is not presented within such time, a written application may be made to the public entity for leave to present such claim.

"(b) The application shall be presented to the public entity as provided in Article 2 (commencing with Section 915) of this chapter within a reasonable time not to exceed one year after the accrual of the cause of action and shall state the reason for the delay in presenting the claim. The proposed claim shall be attached to the application. In computing the one-year period under this subdivision, time during which the person who sustained the alleged injury, damage, or loss is a minor shall be counted, but the time during which he is mentally incapacitated and does not have a guardian or a conservator of his person shall not be counted."

[14]Section 911.6 provides in pertinent part: "(a) The board shall grant or deny the application within 45 days after it is presented to the board. If the board does not act upon the application within 45 days after the application is presented, the application shall be deemed to have been denied on the 45th day.

"(b) The board shall grant the application where: . . . (2) The person who sustained the alleged injury, damage or loss was a minor during all of the time specified in Section 911.2 for the presentation of the claim . . . ."

[15]Section 900.2 provides: " 'Board' means: (a) In the case of a local public entity, the governing body of the local public entity.

"(b) In the case of the State, the State Board of Control."

[16]In *Hom,* after noting that both minors and adults, within a reasonable time not to exceed one year after the accrual of the cause of action, may apply to the public entity for leave to present a late claim, the court observed: "From that point onward, the minor receives more favored statutory treatment. An adult who was not physically or mentally incapacitated during the 100-day period, must show that his failure to act within that period was occasioned by mistake, inadvertence, surprise or excusable neglect and that the public entity was not prejudiced; while the minor need show only that he was a minor during the 100-day claim period. (§ 911.6.) . . . [¶] In effect, Government Code sections 911.6 and 946.6 grant minors a period of claim filing consisting of 100 days plus a reasonable time, not exceeding one year, for filing an application for relief. *If, within the extended period fixed by section 911.4, the minor files an application, relief is mandatory.* [Citation.]" (*Hom* v. *Chico Unified Sch. Dist., supra,* 254 Cal.App.2d at pp. 338-339.)

tion to which a claim relates is the date upon which the cause of action would be deemed to have accrued within the meaning of the statute of limitations which would be applicable thereto if there were no requirement that a claim be presented to and be acted upon by the public entity before an action could be commenced thereon." Thus in the case at bench the date of accrual for the purpose of starting the claim presentation period "is the same as for the statute of limitations which would otherwise be applicable. [Citation.]" (*Wozniak* v. *Peninsula Hospital, supra,* 1 Cal. App.3d at p. 722.) ■ As the court in *Wozniak* also made clear, "In a suit for malpractice the statute of limitations commences to run when the plaintiff discovers the injury *and its negligent cause* or through the exercise of reasonable diligence should have discovered it." (*Id.*) (Italics added.)

Where the plaintiff is a minor, it is not the knowledge or lack thereof of the minor, but the knowledge or lack thereof of the minor's parents which determines the time of accrual of the cause of action. (*Wozniak* v. *Peninsula Hospital, supra,* 1 Cal.App.3d 716, 723; *Myers* v. *Stevenson* (1954) 125 Cal.App.2d 399, 403 [270 P.2d 885].) ■ Therefore Mary's cause of action for damages for medical malpractice against the County accrued when Mary's mother, Mrs. Chandler, discovered, or through the exercise of reasonable diligence should have discovered Mary's injury and its negligent cause. It was then required that not later than the 100th day after such date of accrual, a claim relating to such cause of action be presented to the County by Mary or on her behalf. Since her claim was presented on November 19, 1965, her cause of action must not have accrued earlier than August 11, 1965. Our task, then, is to ascertain whether under the familiar rules governing nonsuits there is any evidence in the record showing, or from which it can be reasonably inferred, that Mary's cause of action accrued subsequent to August 11, 1965.

We begin by considering at length the case of *Wozniak* v. *Peninsula Hospital, supra,* 1 Cal.App.3d 716, not merely because it is germane to the question before us but particularly because it is so close on its facts and in its application of relevant principles as to constitute highly persuasive authority.

In *Wozniak,* Christine Wozniak, a two-year-old minor, otherwise in good health, was operated on to correct a crossed eye and during the operation

suffered a cardiac arrest, causing extensive brain and nerve damage. She was discharged from the hospital three months later, but continued to receive independent treatment for the damage to her legs. Six months after the operation, a nurse engaged to give therapy treatments informed the Wozniaks that Christine's legs might not have been in such condition if the hospital had given her passive physical therapy sooner. Fourteen months after the operation the Wozniaks, consulting an attorney about the hospital bill, were then informed that they might have a claim for negligence. One month later, and about 15 months after the operation, they filed a claim pursuant to section 911.2.

Observing that in determining whether the parents exercised reasonable diligence in discovering the negligence of the hospital, "their action should be liberally interpreted with a view to protecting [Christine's] rights as a minor" (*Wozniak* v. *Peninsula Hospital, supra,* 1 Cal.App.3d at p. 723), the court concluded that there had been no unreasonable delay on their part as a matter of law and reversed a summary judgment in favor of the hospital. "The question of when there has been a belated discovery of the cause of action, especially in malpractice cases, is essentially a question of fact. The facts and circumstances of the medical treatment rendered a patient are within the exclusive knowledge of the hospital and the attending physicians. It is difficult to understand how an injured person could discover the cause of the injury until he has obtained that information." (*Id.* at p. 725.)

The *Wozniak* court reasoned that while the parents were aware of their child's abnormal physical and mental condition after the operation, they had no specific information that the condition was due either to the operation itself or to lack of hospital care. Accordingly, the court held that whether the parents should have believed the condition to be a result of negligence was a question of fact. While reasonable persons might have been alerted by the nurse-therapist's statement, it was also reasonable for the parents to have given it no credence. Finally, the court concluded that since a trier of fact would be warranted in finding that the parents relied on their doctors to keep them informed, it could not be said as a matter of law that the 11-month period after the child's discharge from the hospital was an unreasonable delay in making inquiry as to the cause of injury.

The facts in the case at bench, viewed in the light of the same guiding principles, fall well within the factual boundaries just described. The County argues that the cause of action accrued as to the County and Dr. Skinner in July 1964 when Mary's mother discovered that Mary in fact had a craniopharyngioma. At that time, according to the County's theory,

Mary's mother knew that all the previous doctors and hospitals had misdiagnosed Mary's condition, since they had unanimously concluded that she suffered from anorexia nervosa and that she therefore knew the alleged negligence, namely failure to diagnose a brain tumor.[17]

Plaintiff, on the other hand, argues that although her mother knew of the diagnosis of a craniopharyngioma in July 1964 at Children's Hospital, of the subsequent operation and of the tragic post-operative events and although she felt that Mary's condition after the operation was not normal, she did not know whether the condition was negligently caused. The record reflects that in October 1963, Mrs. Chandler was informed by the County Hospital that Mary was then suffering not from an organic disease but from a psychiatric disorder called anorexia nervosa; in July 1964, nine months later, she knew that there *was* an organic disease, namely craniopharyngioma. However, she did not know whether the craniopharyngioma was detectable nine months earlier; whether, if detectable, the County was negligent in not detecting its existence; or whether, the County did detect its possible existence and then negligently failed to pursue the diagnosis; or whether the County did detect its existence and decided not to reveal its presence; or indeed, whether the failure to detect the tumor contributed to the tragic side effects of its removal.

At this point Mrs. Chandler's position was analogous to that of the Wozniaks' following Christine's operation—the Wozniaks knew that a

---

[17]Defendant County urges that Mary's mother's allegation in the second cause of action of the original and the first amended complaint that "the defendants concealed from this plaintiff the facts constituting her cause of action and said facts were not discovered by her until on or about July 15, 1964, when the said ill effects of said negligence and lack of skill manifested themselves" conclusively establishes the cause of action accrued more than one year prior to the filing of the claim. We disagree for two reasons. First, the County was not named a defendant in either the original or first amended complaint. The County was first named as a defendant in the second amended complaint. That complaint specifically alleged that the facts constituting the County's negligence had not been discovered until October 1965. Second, the proof adduced at trial established that the facts showing the negligent cause as to the County were not discovered until October 1965.

While it is true that Dr. Skinner was named as a defendant in the original and first amended complaint, there was no allegation in either complaint that he was an employee of the County. In the second amended complaint Dr. Skinner was specifically identified as an employee of the County and it was further alleged that the facts constituting the negligence of the County and its employees were not discovered until October 1965. As clearly revealed by the pretrial conference order Dr. Skinner did not claim these allegations to be inconsistent with the earlier pleadings. The proof adduced at trial established the facts as alleged with respect to Mary's mother's knowledge of negligent cause as to Dr. Skinner.

Therefore, Mary's mother's allegations in the original and first amended complaint concerning her discovery of negligence are of no effect as against either the County or Dr. Skinner in determining the date of the accrual of the cause of action.

cardiac arrest followed by severe damage was an abnormal reaction to the crossed-eye operation, but did not know what caused this result, or if it had been caused by the negligence of the hospital. Additionally the *Wozniak* court concluded that the mere statement of the nurse-therapist was insufficient to alert the parents as to the possible negligence of the hospital.

Defendants contend that *Wozniak* is distinguishable from the instant case because Mrs. Chandler acted out her suspicion that Mary had been wronged by contacting attorneys to file a malpractice action and by writing a letter to a newspaper chronicling Mary's sad medical history. All that these actions indicate is that Mrs. Chandler's suspicion of some wrong was sufficiently strong to impel her to seek redress. The first two attorneys whom she contacted refused to accept employment. The letter was not published. In no way did these efforts increase her knowledge of facts constituting the negligent cause of the injury. Indeed, even when Mrs. Chandler retained Mr. Gonick in February 1965, although of course aware of Mary's condition, she had not yet discovered its negligent cause. The evidence does not ineluctably lead to the sole conclusion that she had such knowledge; on the contrary, not until the examination of the medical records on October 19, 1965, did she discover the negligent cause of plaintiff's injury.

This does not end our inquiry. We must determine whether on the present record it can be inferred that Mrs. Chandler exercised reasonable diligence in discovering the negligent cause of the injury. Or to put it another way, we must decide whether it can be said *as a matter of law* that Mrs. Chandler "through the exercise of reasonable diligence should have discovered it." (*Wozniak* v. *Peninsula Hospital, supra,* 1 Cal.App.3d at p. 722.)

Mr. Gonick in his testimony concerning the extent of Mrs. Chandler's knowledge of the injury sustained by her daughter revealed that he had found her as confused and difficult as had the doctors in the case[18] and that he had been unable either from the information conveyed to him by Mrs. Chandler or from his own investigations made from February 9, 1965 to March 24, 1965, to assemble sufficient proof of the claimed malpractice.

---

[18]"My observations were of Mrs. Chandler that she was similar to those made by the doctors, that she was a very confused woman. I don't mean specifically just with respect to the facts that happen, but she was confused, she was paranoiac, people were bugging her telephone, the Department of Social Welfare had somebody out, cops out watching her—" "No. I don't know just what she complained about, but I know she was flashing around, trying to get something done, and I know that when I filed the action that I didn't myself—couldn't generate any facts sufficient to make a cause of action against anybody, and I was using it [the complaint] as a means, as my notes indicate, of discovery to see if we couldn't discover something."

As a result, according to his testimony, he filed an admittedly exploratory complaint alleging negligence on the part of almost all the doctors and hospitals that treated Mary, but conceding lack of knowledge as to which defendants were negligent and in what ways. Unfortunately, the record before us does not reveal why the County had not been included among such named defendants. Finally on October 19, 1965, Mr. Gonick examined the subpoenaed hospital records and discovered the facts allegedly constituting the negligent cause of the injury which could be brought home to the County and Dr. Skinner. At that time it was discovered that Dr. Cramer had diagnosed and had recommended a series of tests for a possible craniopharyngioma, that most of the tests were not performed, that none of these events had been disclosed to Mrs. Chandler, and that on the contrary the County and its employees had represented to her that there were no signs of organic disease.

We conclude that Mrs. Chandler was reasonably diligent in pursuing her suspicion of possible negligence on the part of the various doctors and hospitals, including the County and Dr. Skinner.[19] Indeed, it is difficult to conceive what more she could have done. She contacted two attorneys and wrote a long letter to a newspaper within three months of the final diagnosis and operation. All these efforts proved unavailing. Nevertheless she persisted, and finally persuaded Mr. Gonick to explore the matter. There is no evidence whatsoever that the latter was not reasonably diligent in pursuing discovery or that the examination of the hospital records on October 19, 1965, was unreasonably delayed.

Since it appears from the evidence considered in the light of the applicable rules (see fn. 1, *ante*) that plaintiff's cause of action accrued within 100 days prior to the presentation of her claim to defendant County on November 19, 1965, it was error to grant said defendants' motion for a nonsuit. Accordingly, we reverse the judgment of nonsuit.[20]

---

[19]Defendants assert that *Hirschman* v. *Saxon* (1966) 246 Cal.App.2d 589 [54 Cal. Rptr. 767] and *DeVault* v. *Logan* (1963) 223 Cal.App.2d 802 [36 Cal.Rptr. 145] support their claim that Mrs. Chandler was not reasonably diligent in discovering the negligent cause and should guide this court rather than *Wozniak*. However, both *Hirschman* and *DeVault* are inapposite. Neither case involves a minor or the determination of the accrual of a medical malpractice action in the context of the claims statutes. In both cases the plaintiff, despite a suspicion of negligence by doctors involved in their treatment, failed to take any action for a year. In the case at bench, Mrs. Chandler contacted an attorney within a month of becoming suspicious that there might be negligence involved.

[20]In view of our disposition of the case, it is unnecessary to consider plaintiff's contention that the claims statutes are unconstitutional, both on their face and as applied to minors. However, we note that no arguments or authority have been brought to our attention which would suggest that our decision in *Tammen* v.

## II

### *Appeal from the Judgment on the Verdict*

We now take up plaintiff's appeal from the judgment entered on the verdict in favor of the remaining defendants. Making no attack on the sufficiency of the evidence to support the verdict she contends (1) that one of the attorneys for defendants committed prejudicial misconduct; and (2) that the court erred in admitting certain evidence. We find no merit in any of the points raised. We therefore affirm that judgment.

At the outset of trial, Mr. Craddick, one of the defense attorneys, informed other counsel and the court that his wife was expecting their first baby any day and that he had promised her he would be present with her when the time came. It was agreed, in chambers, that should this happy event occur during the course of trial, the court would recess on that day. Mr. Gonick, attorney for plaintiff, requested that the jury not be informed as to the reason for Mr. Craddick's absence as he did not wish that "undue emphasis should be placed on the fact that [Craddick's] wife was expecting a child."

The Craddick baby was born early in the morning of March 11, 1969. Court was adjourned that day and the trial postponed one day; through inadvertence, however, the jury was not informed in advance of the continuance. Upon their arrival at court the jurors were advised that the trial had been continued due to Mr. Craddick's absence but in accordance with the agreement, were not told the reason.

On the same morning, Mr. Heafey, one of the defense counsel, upon entering the courthouse observed Mr. Gonick and his wife conversing with Mrs. Chretien, one of the jurors. Mr. Heafey demanded an explanation and according to Heafey, Mr. Gonick responded as follows: "Well, the juror is all upset at Craddick, that she was over there telling me that it wasn't fair to not pay her for that day, and that she had to get back—that she wasn't told that she did not have to come down here, and then be sent back home without getting paid, and that she was very upset." Mr. Gonick reported the substance of this conversation to the trial judge.

On the following morning before the trial resumed, Mr. Craddick returned to the courtroom with cigars and candy. Neither the judge nor the jury were yet present. Mr. Craddick distributed the candy and cigars to counsel, including Mr. Gonick, and to the court attaches. Upon being in-

---

*County of San Diego, supra,* 66 Cal.2d 468, 481, upholding the constitutionality of the claims statute, is no longer valid.

formed of the jury's resentment at his unexplained absence, Mr. Craddick wrote a note, "It's a boy" on a card and asked the bailiff to take the note along with two cigars and a box of candy to the jury in the jury room. Plaintiff contends that Mr. Gonick was at that time unaware of the gift and message to the jury.

Upon resumption of the trial, the judge made reference to the birth of the Craddick baby but was apparently unaware of the distribution of candy and cigars to the jurors.[21] Although Mr. Gonick later learned of the incident and initially forebore from entering any objection, he subsequently changed his mind and moved for a mistrial.[22]

Observing that it was customary to give cigars and candy in celebration of a birth, the court denied the motion. It denied a similar motion one week later. The incident was also made a basis of plaintiff's motion for a new trial which was also denied.

As the main reason for reversing the judgment on the verdict, plaintiff now contends that the above-mentioned conduct of Mr. Craddick constituted prejudicial conduct as a matter of law. Relying upon a number of decisions both in California and other jurisdictions dealing with "gifts" to jurors, she argues that conduct like that now under examination requires automatic reversal.

We pointed out in *Horn* v. *Atchison T. & S. F. Ry. Co.* (1964) 61 Cal.2d 602, 610 [39 Cal.Rptr. 721, 394 P.2d 561], that "Generally a claim of

---

[21]The record reflects the following: "THE COURT: Good morning, ladies and gentlemen of the jury. I, of course, have a pleasant announcement to make on behalf of Mrs. Craddick. She gave birth to a seven pound boy yesterday morning. Mr. Craddick is to be congratulated.

"MR. GONICK: He is passing out cigars, too, your Honor.

"THE COURT: He has added to the population explosion. One other announcement I would like also to make. There was a bit of confusion in trying to advise the jury that we wouldn't be in session yesterday, and I shall make an order to the effect that all jurors will receive their compensation as though they were here."

[22]On the following day the full incident was reported in a local newspaper. Sometime that day, Mr. Gonick discovered that the cigars and candy had been given to the jury. He made no objection either then or the next morning at the start of the proceedings. He at no time asked that the jury be admonished. Instead the next day, following an adverse evidentiary ruling, Mr. Gonick moved for a mistrial. He admitted in open court that he had intended to overlook the gift to the jury, largely because Mr. Craddick had indicated he in turn would not object to the admission of certain evidence offered by Gonick and would not require the latter to produce a certain witness. Nevertheless, Mr. Craddick objected to the admission of certain evidence. Mr. Gonick decided to move for a mistrial, stating: "The thing is this. If they are going to take this attitude I don't feel so inclined to waive this Jury proposition."

misconduct is entitled to no consideration on appeal unless the record shows a timely and proper objection and a request that the jury be admonished. . . . In the absence of a timely objection the offended party is deemed to have waived the claim of error through his participation in the atmosphere which produced the claim of prejudice." (See 4 Witkin, Cal. Procedure (2d ed. 1971) p. 2982 et seq., pointing out the necessity of assigning the allegedly objectionable conduct as misconduct and asking that the jury be instructed to disregard it. "If this is not done the error is waived unless the misconduct was of so aggravated a character that it could not be cured by any instruction." (*Id.* at p. 2983.))

■ In the instant case we make two observations. First, there is no question but that Mr. Craddick's conduct was improper and constituted misconduct. However innocent in purpose, it was at least an act of bad judgment. But, to come to the second point, plaintiff's counsel made no attempt to assign his opponent's behavior as misconduct. Indeed he appears to have been willing to overlook the incident in return for concessions in respect to the production of evidence. Quite apart from indicating that plaintiff's counsel probably regarded the incident as of little significance, this state of affairs certainly emphasizes his failure to object. We therefore conclude that plaintiff has waived the misconduct unless, as previously pointed out, it was of such an egregious nature that it could not have been cured by a corrective instruction to the jury.

In *Horn* we quoted the language of this court in *Tingley* v. *Times-Mirror Co.* (1907) 151 Cal. 1, 23 [89 P. 1097]: "It is only in extreme cases that the court, when acting promptly and speaking clearly and directly on the subject, cannot, by instructing the jury to disregard such matters, correct the impropriety of the act of counsel and remove any effect his conduct or remarks would otherwise have." (*Horn* v. *Atchison, T. & S. F. Ry Co., supra,* 61 Cal.2d 602, 610.) Only misconduct so prejudicial that an admonishment would be ineffective excuses the failure to request such admonishment. (*Hoffman* v. *Brandt* (1966) 65 Cal.2d 549 [55 Cal.Rptr. 417, 421 P.2d 425].)

Conduct such as that involved in this case strikes close to the heart of the jury's integrity. We believe that such integrity must be held sacrosanct and provided with the sternest protection from the slightest whisper of importuning on the part of counsel. As we have said, although Mr. Craddick's conduct may have resulted only from bad judgment, we are of the opinion that it was improper. Nevertheless under the circumstances of the case, we are satisfied that any effect it might have had on the jury could have been entirely removed by an admonishing instruction. We should give

weight to the trial judge's appraisal of the incident; the implication of his remarks is that what has been deemed a customary gesture in everyday life, was unthinkingly and unfortunately brought into the courtroom where it had no place. As such, it is highly unlikely that it was regarded as anything but such a custom, which incidentally had been extended to everyone in the courtroom. It was not done secretly, but in open court, in the presence of opposing counsel, under the assumption that opposing counsel knew what was happening. The trial judge concluded there was no prejudicial effect. Counsel himself appeared to regard it with minimal concern. These circumstances make it clear that at most plaintiff was entitled to an admonishing instruction.

Plaintiff next contends that the opinions of 54 physicians, none of whom testified in court, offered to prove that there was nothing on the 1961 X-rays to suggest the existence of a craniopharyngioma, were hearsay and that it was prejudicially erroneous to admit this testimony. We agree this testimony was hearsay and that it was erroneously admitted. However, we have concluded that the admission of this testimony was harmless error.

It will be recalled from the factual narrative earlier in this opinion that on November 18, 1961, skull X-rays were taken of Mary at Children's Hospital, because the public school pediatrician thought that Mary's cachectic condition might be due to a brain tumor. The radiologist at Children's Hospital, Dr. Peterson, examined the X-ray and concluded that there was no sign of abnormality, no calcification, no erosion, no tumor.

Mary's condition persisted, but no new skull X-rays were taken until July 3, 1964. At that time a brain tumor, a craniopharyngioma, was diagnosed. Plaintiff contended that the radiologists at Children's Hospital negligently failed to detect the existence of the tumor when they examined the X-ray in 1961.

Defendant radiologists called three doctors to give their opinion whether the 1961 X-rays showed the claimed tumor and whether a radiologist, applying the prevailing standard of medical practice, should have discerned the abnormality. Dr. Thomas Newton, a radiological expert, testified that in his opinion the X-rays were normal. He further testified that in his opinion a report by a radiologist that the X-rays showed no abnormality would conform to the standard of practice in the applicable area at the applicable time. Dr. Newton then testified over objection that in the presence of defense counsel he had called in four other supposedly neurological and radiological experts at his place of employment, showed them the 1961

X-rays, described Mary's symptoms as of 1961 and asked them whether they detected any abnormality in the X-rays.[23] Dr. Newton then testified that none of the four doctors detected any abnormality.

Dr. Lawrence Arnstein, a neurosurgeon with substantial experience relating to craniopharyngiomas, testified that he examined the 1961 X-rays and that it was his opinion that the X-rays showed no abnormal calcification. He then testified over objection that he presented the X-ray films at "grand rounds at Stanford" to the students, resident staff and faculty doctors, about 50 in number.[24] He related Mary's symptoms as of 1961 to the group and asked whether any one then present could see any abnormality in the films.

The objection was overruled and Dr. Arnstein testified that everyone present was competing to detect any kind of possible abnormality and that he regarded the fact that no one reported seeing any abnormality as significant. Moreover, he then showed them the 1964 X-ray films showing the abnormality and asked them whether by seeing the films together could they now find something abnormal in the 1961 film.

Dr. Arnstein then testified over plaintiff's objection on the ground of hearsay that "there continued to be no one, even knowing what the child subsequently developed, no one felt the film taken in 1961 demonstrated any significant pathology."

It is obvious that the testimony concerning the opinion of the other doctors who were not present in court, and who had not been qualified as experts was hearsay. " 'The reason for this is obvious. The opportunity of cross-examining the other doctors as to the basis for their opinion, etc., is denied the party as to whom the testimony is adverse.' " (*Lynch Meats of Oakland, Inc.* v. *City of Oakland* (1961) 196 Cal.App.2d 104, 112 [16 Cal.Rptr. 302]; *Frampton* v. *Hartzell* (1960) 179 Cal.App.2d 771, 773 [4 Cal.Rptr. 427].)

Defendants contend, however, that the testimony concerning the opinions

---

[23]"Q. And will you tell us whether any of the four doctors that you called into your office on that occasion and to whom you presented those films detected any abnormality in any of the films on display?"

Mr. Gonick objected that the answer would be hearsay.

"MR. CRADDICK: It's admissible. I don't have to call every doctor in the area.

"THE COURT: Objection overruled . . . ."

[24]"Q. As a result of such presentation, was your opinion with respect to the interpretation of those films influenced or strengthened or weakened in any respect?

"A. I think my opinion was strengthened because nobody else saw anything abnormal in those films either.

"Q. What was the basis—

"MR. GONICK: I'll ask that that last remark go out as to what no one else saw. . . ."

of the other doctors was admissible to show the basis of the testifying doctor's opinion under the doctrine of limited admissibility as applied in *Kelley* v. *Bailey* (1961) 189 Cal.App.2d 728, 737-738 [11 Cal.Rptr. 448].[25] This rule has no application to the case at bench for two reasons. First, the opinions of the out-of-court doctors in this case were not used by either testifying doctor in the course of treatment or diagnosis of plaintiff. They were consulted as experts and then called as witnesses to offer expert opinion evidence. It is clear that doctors can testify as to the basis of their opinion (see Witkin, Cal. Evidence (2d ed. 1966) § 410, pp. 368-369), but this is not intended to be a channel by which testifying doctors can place the opinion of innumerable out-of-court doctors before the jury.[26]

Second, it is eminently clear that the testimony concerning the out-of-court doctors' opinion on the crucial issue in the case was offered solely for the improper hearsay purpose, namely as "independent proof of the facts." (*Kelley* v. *Bailey, supra,* 189 Cal.App.2d at p. 738.) When Mr. Gonick objected to Dr. Newton's testifying as to the opinion of the other four doctors as hearsay, defense counsel Mr. Craddick quipped: "I don't have to call every doctor in the area." The record discloses that the testimony of Doctors Newton and Arnstein as to the views of the 54 doctors they respectively consulted was actually offered to establish the opinion of such latter doctors that the 1961 X-ray films showed no abnormality. This testimony was clearly hearsay.

While we do not deem the possible effect of this testimony either inconsequential or negligible, we have concluded that its admission was not prejudicial. The properly admissible testimony to the effect that the 1961 X-rays

---

[25]In *Kelley*, the court said: "It is argued that the court erred in receiving into evidence the opinion of Dr. Meyers who was not called to the witness stand. Defendant's witness, Dr. Fillerup, after diagnosing a moderate whiplash syndrome in plaintiff, sent him to Dr. Meyers who made a report to Dr. Fillerup which he used in his own studies of plaintiff's case; he also consulted with Dr. Meyers and thereby strengthened his own opinion of plaintiff's condition. Portions of this report were read to the jury . . . . There was no error in this. Such a report stands on a parity with a patient's history of an accident and ensuing injuries given to his physician. *It is admissible not as independent proof of the facts but as a part of the information upon which the physician based his diagnosis and treatment, if any.* [Citations.] Upon request the jurors should be told and doubtless would have been told that that evidence was received and was to be considered for this narrow and limited purpose. . . . Counsel made no such request at bar and the judge had no obligation to instruct *sua sponte.*" (Italics added.) (Accord, *Springer* v. *Reimers* (1970) 4 Cal. App.3d 325, 338 [84 Cal.Rptr. 486].)

[26]In order to avoid a flood of out-of-court doctors' opinions pouring through the limited admissibility channel of *Kelley*, the *Kelley* rule is applicable only in situations where the out-of-court doctors' opinion is truly "on a parity with a patient's history . . . given to his physician" and is "a part of the information" used by the physician in "diagnosis and treatment." (*Kelley* v. *Bailey, supra,* 189 Cal.App.2d at p. 738.)

showed no abnormality so completely overshadowed the testimony to the contrary that the additional improper accumulation of the hearsay evidence in our view had no prejudicial effect. After an examination of the entire cause, including the evidence, it does not appear to us to be reasonably probable that a result more favorable to plaintiff in respect to this appeal would have been reached in the absence of the above error. We cannot say that there has been a miscarriage of justice. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

Finally, plaintiff asserts that the court committed error in making four rulings which errors, she claims, taken individually had a significant impact on her case, and taken in combination had a "destructive cumulative effect."[27] We have carefully considered plaintiff's contentions and are satisfied that they are entirely without merit.

The judgment of nonsuit is reversed. The judgment entered on the verdict in favor of the remaining defendants is affirmed.

The prevailing party or parties on each appeal shall recover costs on appeal.

Wright, C. J., McComb, J., Tobriner, J., Mosk, J., Burke, J., and Clark, J., concurred.

The petition of respondents County of Contra Costa and Skinner for a rehearing was denied April 10, 1974, and the opinion was modified to read as printed above.

---

[27]The trial court properly exercised its discretion (1) in excluding a question and answer from a deposition of a doctor-employee of County Hospital as an alleged admission because the County was not a defendant on the jury verdict; (2) in limiting the use of two medical articles on craniopharyngioma when plaintiff's counsel attempted to use these articles for a different purpose subsequent to admission; (3) in excluding an answer to interrogatories by Children's Hospital concerning the contributory negligence of Mary's mother because the answer did not constitute an admission against interest; and (4) in limiting Mary's appearance to 10 minutes in the courtroom.