[Civ. No. 49372. Second Dist., Div. Two. Jan. 18, 1978.]

PATRICK M. REYNOLDS, Plaintiff and Appellant, v.
CITY OF LOS ANGELES et al.,
Defendants and Respondents.

COUNSEL

Stephen Warren Solomon and Ralph B. Saltsman for Plaintiff and Appellant.

Burt Pines, City Attorney, John B. Rice, Senior Assistant City Attorney, and Neil C. Baker, Deputy City Attorney, for Defendants and Respondents.

OPINION

**ROTH, P. J.**—Patrick M. Reynolds, a police officer, was, on February 18, 1972, charged by his watch officer, Captain Holmes, with five violations of department regulations which directly put his veracity in issue; eight others of failure to attend court after proper subpoena or adequate instruction and one violation of failure to be alert on duty; all occurring between June 28, 1971, and December 18, 1971.

Concurrently with delivery to Reynolds of the said charges in written form on February 18, 1972, Reynolds was suspended from duty and placed on notice that he would be required to answer those charges before a board of rights.[1]

On or about the same day, Reynolds selected Lieutenant Salvino, a watch officer for whom Reynolds was then working, to represent him before the board. The record shows that Salvino had had experience in appearances before the Board in other matters and that Reynolds had great confidence in Salvino.[2] The two thereafter had a number of long conferences specifically on each of the charges and on all the facets of Reynolds' defense, including strategy. In one of these conferences prior

[1]The Los Angeles Police Department has an internal disciplinary procedure, codified in the Los Angeles City Charter, which procedure is for the purpose of determining the existence of and punishing breaches of departmental rules and regulations. One facet of that procedure is a hearing before a "Board of Rights" composed of superior officers. That board acts as the finder of fact and recommends to the Chief of Police the measure of discipline to be imposed. When a member of the department is accused of a violation leading to a hearing before a "Board of Rights," the accused member has a right to be represented by private counsel or to select any other member of the department below the rank of captain to act as his defense representative.

[2]Reynolds testified:
"He was my watch commander and he had been very—more than fair in my treatment as a policeman and was what I thought—you know, he was a very good officer."

to February 29, Salvino advised Reynolds that he had been requested to investigate Reynolds for his failure to qualify at the shooting range for one month, and a false report in connection with an emergency trip to the hospital while Reynolds was working under him.[3] Salvino told Reynolds that the failure to qualify was a minor charge, not one of the fourteen, and even if true was generally not of board dimensions, and at most called for a two-day suspension.

On February 29, a long conference was had between Reynolds and Salvino at the outset of which Salvino told Reynolds that he had investigated the target practice incident and that Reynolds had lied to him about it as well as about the emergency trip to the hospital. Lieutenant Salvino's ensuing statements and Reynolds' actions on February 29 are reflected in the trial court's findings of fact:

"18. On February 29, 1972, Lt. Salvino informed the Petitioner that there were two basic reasons why he felt he should withdraw as the Petitioner's defense representative. First, Lt. Salvino informed the Petitioner that he believed the Petitioner had been untruthful on many occasions and because of this fact it would be difficult for him to adequately represent the Petitioner. Second, Lt. Salvino informed the Petitioner that there was the possibility that the Department would decide to add the charges of failure to qualify and giving false and misleading statements to leave the division to the charges already to be considered by the Board of Rights. Lt. Salvino further informed the Petitioner that if the charges were considered by the Board of Rights, he would probably be called to testify in relation to those charges.

" . . . . . . . . . . . . . . . . . .

"20. On February 29, 1972, Lt. Salvino advised the Petitioner that he could get a continuance of the Board of Rights hearing and that he would assist the Petitioner in obtaining a continuance.

"21. On February 29, 1972, Lt. Salvino advised the Petitioner that he could obtain a new defense representative and that he would assist the Petitioner in obtaining a new defense representative.

---

[3]These charges were unrelated to any of the 14 filed by Captain Holmes. The charge with respect to the hospital arose from permission granted to Reynolds by Salvino. Reynolds represented to Salvino an emergency situation with respect to a relative which proved to be false.

"22. On February 29, 1972, Lt. Salvino and the Petitioner discussed the alternative courses of action that the Petitioner had open to him. One of the alternatives discussed was resigning in lieu of standing trial at the Board of Rights hearing.

"23. On February 29, 1972, Lt. Salvino and the Petitioner discussed the possibility of the Petitioner securing employment with another police agency after leaving the Los Angeles Police Department.

"24. Lt. Salvino did not represent to the Petitioner that he could, in fact, obtain employment with another police agency.

"25. On February 29, 1972 Lt. Salvino and the Petitioner discussed the Los Angeles Police Department resignation form and the information that would go on it.

"26. Lt. Salvino did not represent to the Petitioner that nothing would be added to the resignation form by other personnel of the Los Angeles Police Department.

"27. Lt. Salvino did not represent to the Petitioner that no information relating to the charges pending against him and his resignation in lieu of facing a Board of Rights would remain in his personnel packet.

"28. On February 29, 1972, the Petitioner tendered his resignation from the Los Angeles Police Department by signing a resignation form.

"29. On or about February 29, 1972, the Petitioner's resignation was accepted by the Chief of Police for the Los Angeles Police Department."

■ Reynolds contends that Lieutenant Salvino breached his fiduciary duty to him as he did resign from the Los Angeles Police Department because Salvino represented to him and allowed him to believe (a) that he could obtain employment elsewhere as a police officer; and (b) that nothing harmful would or could be added to the resignation form as causes for the resignation except that which Reynolds gave as his reasons.

Two days of trial were spent in taking the testimony primarily of Salvino and Reynolds on precisely what representations, if any, were made by Salvino to Reynolds, and the testimony in court of each was fortified by the deposition of each previously taken and introduced in

evidence. On the bare record and wholly aside from the fact that the trial judge had the witnesses before him as an aid to determining credibility, and the rule of law which requires this court to accept findings of fact based upon substantial evidence, an analysis of Reynolds' testimony as to what was said between Salvino and himself to support his contention on the subject of what goes into a resignation form and the probability of Reynolds obtaining future employment is, to put it charitably, barely sufficient to raise an issue of fact. The issues of fact specifically raised and all implicit results thereof were unambiguously found against Reynolds by the trial court. The trial court expressly found that none of these asserted breaches of fiduciary obligations occurred. These findings, supported by substantial evidence, must be accepted by this court.

■ Wholly aside from the fact that the trial court found and decided that Reynolds had no claim against any of the respondents, the trial court upon testimony given solely by Reynolds in an effort to cure Reynolds' omission to timely file a claim if he had one, found that on the facts as recited by Reynolds, the claim was untimely filed.

Reynolds filed a demand for reinstatement on September 27, 1972. The trial court found that Reynolds' claim was barred by a 90-day statute of limitations (§ 112½ of the city charter) which requires that a demand for reinstatement be filed within that period after discovery of the fraud or mistake which led to the resignation. Specifically, the trial court found:

"30. During the month of April and May of 1972, the Petitioner applied for employment with police agencies other than the Los Angeles Police Department.

"31. No later than the first part of June, 1972, the Petitioner's applications for employment were rejected by the Cyprus, Montebello, and Bell Gardens Police Departments.

"32. In the first part of June, 1972, the Petitioner contacted the Bell Gardens Police Department regarding their rejection of his employment application. He was informed that the Bell Gardens Police Department would have accepted his application but for the information appearing in his Los Angeles Police Department personnel file.

"33. In the first part of June, 1972, the Petitioner understood that the Bell Gardens Police Department was referring to the information

relating to the charges that had been brought against him by the Los Angeles Police Department and his resignation in lieu of facing a Board of Rights.

"34. On September 27, 1972, the Petitioner filed a demand for reinstatement to his position of temporarily relieved from duty with the Civil Service Commission for the City of Los Angeles.

"35. At no time did the Petitioner file a claim for back wages.

"36. On November 13, 1972, the Civil Service Commission refused to assume jurisdiction to consider the Petitioner's demand for reinstatement because of the statute of limitations contained in Section 112½ of the Los Angeles City Charter.

"37. The Petitioner did not file his demand for reinstatement within 90 days of the time that he discovered or should have discovered, in the exercise of reasonable diligence, the underlying facts constituting the alleged mistake or fraud."

Finding of fact No. 32 is dispositive as to the time of discovery of the alleged fraud or breach of fiduciary duty.[4]

The judgment is affirmed.

Fleming, J., concurred.

---

[4]It is worth noting that upon the conclusion of the evidence and after the same had been completely and thoroughly argued by appellant's counsel, the trial judge briefly and forthrightly ruled on the issues from the bench as follows:

"THE COURT: Well, I don't believe that Officer Reynolds is entitled to the relief which he requests. I think it is barred on two independent grounds.

"First of all, the demand for reinstatement is untimely under section 112½ of the Charter of the City of Los Angeles.

"He testified that by early to middle June of 1972 after he had been turned down by two or three police departments, the Bell Gardens sergeant said that it was because of a beef in his package. And the fraud that he alleges is, first, that there wouldn't be anything added to the resignation form and, second, that he could get other employment. I think that certainly in the exercise of due diligence he should have discovered the fraud not later than that.

"Now, secondly, by the preponderance of evidence, the Court believes that the resignation was not induced by fraud or mistake, whether you call it actual fraud or constructive fraud.

"Accordingly, the peremptory writ is denied and the alternative writ is discharged."

The trial court having specifically found as facts that misrepresentations as alleged were not made, it was unnecessary for the trial court to find that Reynolds was misled by representations which were not proved.

**COMPTON, J.**—I dissent.

In my opinion, on the basis of this record, the majority's deference to the trial court's fact finding power is not justified. True, the trial court as the determiner of the credibility of the witnesses, credited Lieutenant Salvino's testimony as to what occurred in the critical conversation which preceded Reynold's resignation, but an analysis of that conversation, even as portrayed by Lieutenant Salvino, leads to the inescapable conclusion that Reynolds was the victim of a constructive fraud.

It should be observed at the outset that following the critical conversation Reynolds executed the resignation form and thereby took, what was for him, a very critical and serious step, i.e., the surrendering of a valuable contractual employment right. (*O'Dea* v. *Cook,* 176 Cal. 659 [169 P. 366]; *Kern* v. *City of Long Beach,* 29 Cal.2d 848 [179 P.2d 799]; *Wallace* v. *City of Fresno,* 42 Cal.2d 180 [265 P.2d 884].) It is not surprising then that, as Lieutenant Salvino testified, Reynolds gave indications of being emotionally upset during the conversation.

Also significant is the fact that Reynolds apparently reposed a high degree of confidence in Salvino. Salvino was aware of that fact and testified that as a prelude to the discussion concerning resignation "he [Reynolds] told me that his whole career was being a police officer." Salvino also was aware that a fiduciary relationship still existed between them.

In response to a question, Salvino told Reynolds that "it would be a little easier" to get a job with another police agency if he resigned rather than face a board of rights. Salvino told Reynolds that other small departments would probably "look very seriously at a Los Angeles policeman because of his extensive training."

When Salvino got around to explaining the resignation form to Reynolds he pointed out a portion at the top of the form where Reynolds could indicate his reasons for resigning and it was Salvino who suggested that Reynolds enter "personal family problems" in that space.

Salvino then assured Reynolds that these reasons at the top of the form "would not be altered in any manner whatsoever." He twice repeated that assurance.

Salvino then pointed out .to Reynolds that the bottom of the form contained a place for the captain to make comments. He reminded Reynolds that the captain had not previously held Reynolds in very high regard but he impressed on Reynolds that he (Salvino) had no control over nor any idea as to what Captain Holmes might put on that form. Finally Salvino repeatedly told Reynolds that the decision was "up to him."

Reynolds, of course, testified that he gained the impression from the various statements by Salvino that nothing derogatory would appear in his file and that his chances at other employment would not be impaired if he resigned.

Reynolds does not seriously contend that there was any showing of actual fraud. Accepting, as I have, the credibility of Lieutenant Salvino, it is clear that he did not tell Reynolds anything that was untrue nor did he knowingly make any misrepresentations.

The whole atmosphere of the conversation, however, was conducive of the situation which is at the root of this problem—a situation fraught with the possibility of misunderstanding of the effect of the resignation leading to an ill-considered decision to resign.

From the record I see a picture of a fairly young man who, according to Salvino, was in a highly emotional state and on the verge of tears, talking to a more experienced superior officer during the wee hours of the morning and seeking advice on a decision that could affect his entire future.

Under these circumstances of repeated assurances that his "reasons" for resigning would not be altered or changed as far as the records were concerned, it would not be unreasonable for the individual to interpret that as meaning that his record would not contain matters which contradicted the stated reason for resignation.

At the time of this fateful decision, Reynolds had basically three options available to him, (1) take his chances on an acquittal by the board, (2) attempt to dispose of the charges by a disposition short of termination, or (3) resign. Nowhere in the record is there evidence that if Reynolds had been found guilty by the board he would have necessarily

been terminated.[1] It appears, however, that Salvino and Reynolds proceeded on that assumption.

It seems self-evident that before deciding to take the drastic step of resigning Reynolds should have had the benefit of an objective and independent assessment of the probable consequences of a hearing before the board of rights. Salvino well knew at the time that, because of his position of conflict, he could not give Reynolds that very critical type of advice, and, of course, as it turned out, Reynolds gained absolutely nothing by resigning.

Constructive fraud consists of the breach of a fiduciary duty without fraudulent intent, which breach misleads to his prejudice the person who claims to be defrauded. (Civ. Code, § 1573.)

"[A] confidential relationship may exist whenever a person with justification places trust and confidence in the integrity and fidelity of another." (*Odorizzi* v. *Bloomfield School Dist.,* 246 Cal.App.2d 123, at p. 129 [54 Cal.Rptr. 533].)

The duty of a fiduciary generally is "the obligation to render a full and fair disclosure to the beneficiary of all facts which materially affect his rights and interests." (*Neel* v. *Magana, Olney, Levy, Cathcart & Gelfand,* 6 Cal.3d 176, at pp. 188-189 [98 Cal.Rptr. 837, 491 P.2d 421]; also see *Martin* v. *Martin,* 110 Cal.App.2d 228, at p. 233 [242 P.2d 688].)

Under the circumstances which prevailed at the time, what Lieutenant Salvino said to Reynolds was less important than what he did not say. Salvino's testimony is pregnant with the inference that he believed that Captain Holmes would in fact make derogatory comments and further that Reynolds would in fact have a very difficult time obtaining employment with any other police agency.

His protestations that he had no way of knowing what the captain would do or what the reactions of other police agencies would be concealed his true belief.

Because of the fact that at that point there still existed a fiduciary relationship between him and Reynolds, it was not enough for Salvino to adopt the detached, hands-off attitude that he did.

---

[1]The charges consisted in the main of failing to appear in court when subpoenaed and submitting false overtime reports.

The single most important duty that Lieutenant Salvino had and failed to discharge was to prevent or at least not to facilitate Reynolds' decision to resign until the latter had the benefit of advice from an objective and independent source.

Instead, it was Lieutenant Salvino who first suggested resignation as an option. He stated to Reynolds that a decision had to be made "soon." "Let's make a decision." "Let's do whatever you want to do but let's do it in a rapid manner." Finally he told Reynolds he could consult with his wife about the matter and come back the next day. When the decision was arrived at, Salvino had a Sergeant Coneau prepare the form for Reynolds' signature.

This aura of emergency was unnecessary. While I am aware of the importance of the ability of a police department to discipline its members and, where indicated, terminate persons unsuited to the job, the efficiency of an agency as large as the Los Angeles Police Department would certainly not have been impaired by the delay that even a modicum of reasoned deliberation would have occasioned.

Significantly the trial court made no findings on the question of whether Lieutenant Salvino made a full disclosure of material facts or whether Reynolds was or was not misled, or whether the resignation was an intelligent and voluntary decision.

The trial court's conclusion that no constructive fraud existed appears to have been premised on the fact that Lt. Salvino made no express, false representations concerning the information that would be placed in Reynolds' personnel file or the likelihood of Reynolds' obtaining other employment with a law enforcement agency. Constructive fraud, however, does not require express misrepresentation.

In my opinion Lieutenant Salvino's conduct amounted to constructive fraud in pressing Reynolds for a decision and failing to give the advice that he should have given. Of course, because of his position of conflict, he was in fact incapable of giving that advice which was an uncolored and realistic assessment of the consequences of the various options available. That incapability led inexorably to the ultimate duty which was breached—the duty to disclose to Reynolds the need for the intervention of an independent and objective advisor before permitting Reynolds to resign. In short, Salvino failed to make a full and fair disclosure of all facts which materially affected Reynolds' situation.

Neither the findings nor the evidence support the conclusion of an absence of constructive fraud.

### THE TIME LIMITATION OF
### LOS ANGELES CITY CHARTER
### SECTION 112½

On a previous appeal to this court, Division Five ruled that the principles applicable to any action based on fraud dictated that the time limit set forth in section 112½ of the city charter began to run from the date that the underlying facts were discovered or should have been discovered. (*Reynolds* v. *City of Los Angeles,* 43 Cal.App.3d 738 [118 Cal.Rptr. 59].)

Reynolds contacted his attorney around June 14 or 15, 1972—the day he received the information from the Bell Gardens Police Department concerning the existence of derogatory information in his file. The attorney had him prepare a written narrative of the events leading up to his resignation. Apparently sometime in July, Reynolds was advised by his attorney that a basis for rescission of his resignation existed. A subsequent examination of his personnel file apparently revealed that Captain Holmes had in fact made unfavorable comments on the resignation form.

Although Reynolds was at all times aware of the objective circumstances of his resignation and Salvino's participation, it was not until at least June 15 that he had any reason to suspect fraud. Upon receipt of that information he moved expeditiously to contact a lawyer and seek his advice.

The issue is when did the 90-day period begin to run? I am of the opinion that June 15, 1972, is the earliest date upon which the time could begin to run. If that is the date of "discovery," then the application was 12 days late since the time would have expired on September 15. If, on the other hand, the time did not begin to run until Reynolds obtained information beyond what he was told by the Bell Gardens Police Department, then the application for reinstatement was timely.

An overriding consideration which plays a part in the determination of whether Reynolds should be barred is the fact that this is an equitable proceeding. The city charter provision is not jurisdictional and a court of equity can grant relief from strict compliance with its provisions where

an individual has under all the circumstances acted with reasonable diligence and no prejudice to the city is evidenced.

The charter provision in question, on its face, applies to demands for reinstatement after a person has been "illegally, wrongfully or invalidly laid off, suspended or discharged." It has been interpreted as applying to cases where the employee resigned under coercion or duress. (*Moreno* v. *Cairns,* 20 Cal.2d 531 [127 P.2d 914]; *Temple* v. *Horrall,* 92 Cal.App.2d 177 [206 P.2d 909].) Normally "discovery" would not be an issue where the claim was coercion or duress.

*Reynolds* v. *City of Los Angeles, supra,* 43 Cal.App.3d 738, as noted, held that the "discovery" rule of fraud would apply to this case even though city charter section 112½ does not refer to "accrual of the cause of action." (Cf. Gov. Code, § 911.2.) Thus the charter provision must be read to commence the running of the time period at the time of the "accrual" of the right to reinstatement.

In *Whitfield* v. *Roth,* 10 Cal.3d 874 [112 Cal.Rptr. 540, 519 P.2d 588], a case applying Government Code section 911.2 to a claim of medical malpractice against a governmental entity, it was held that the period for filing a claim did not begin to run until discovery of (1) the injury, and (2) its *negligent cause.* The cause of action accrued only on discovery of both of these matters.

The general rule concerning "discovery" and accrual of a cause of action for fraud on the other hand is that the significant event generally is discovery of the facts constituting the fraud rather than discovery of the law which makes those facts fraudulent. (54 C.J.S., § 189, pp. 188-189; *Lady Washington C. Co.* v. *Wood,* 113 Cal. 482 [45 P. 809]; *Hayward Union etc. School Dist.* v. *Madrid,* 234 Cal.App.2d 100 [44 Cal.Rptr. 268].)

That latter rule is often more easily stated than applied and there is no formula or hard and fast criteria as to what constitutes "discovery" which can be applied without exception in every case. Where the alleged fraud arises out of a fiduciary relationship less diligence is required of the person defrauded than would otherwise be the case. (*Lee* v. *Hensley,* 103 Cal.App.2d 697 [230 P.2d 159]; *Hobart* v. *Hobart Estate Co.,* 26 Cal.2d 412 [159 P.2d 958]; *Gross* v. *Needham,* 184 Cal.App.2d 446 [7 Cal.Rptr. 664].) That rule applies even though the fiduciary relationship has terminated. (*Hobart* v. *Hobart Estate Co., supra,* at p. 440.)

When Reynolds was told by the Bell Gardens Police Department that its reason for rejecting him was the existence of derogatory information in his personnel file, it aroused his suspicion. His right to reinstatement, however, did not "accrue" at that time. More information was needed. The statement by a sergeant at the Bell Gardens Police Department may not have been true but even so the nature of the derogatory information was unknown to Reynolds as were the facts constituting Salvino's breach of duty. In other words, the "cause" of Reynolds' difficulty or the "unlawfulness" of his termination were not yet fully discovered. The defect in his resignation was the result of very subtle and intricate circumstances which were a mixture of fact and law.

"A defrauded person . . . is not barred from maintaining an action merely because he commenced an investigation . . . if it is difficult for [him] to ascertain all the facts or he is *not competent to judge the facts without expert assistance.*" (*Hobart* v. *Hobart Estate Co., supra,* 26 Cal.2d at p. 435, italics added.) This language appears in a discussion of the element of reliance rather than the tolling of the statute of limitations. However, the concept is germane to the issue of "discovery" and the determination of the point at which a person should be charged with sufficient knowledge to impose a duty on him to move diligently in commencing his action for redress.

In this case Reynolds did move diligently when he contacted his attorney immediately upon receipt of the information from Bell Gardens. After providing his attorney with all of the facts and upon receipt of "expert assistance" in judging those facts he did, in my opinion, act diligently in complying with city charter section 112½.

I would reverse the judgment and direct the trial court to enter a judgment granting Reynolds' petition for a writ of mandate.

Appellant's petition for a hearing by the Supreme Court was denied March 16, 1978. Bird, C. J., was of the opinion that the petition should be granted.