[Civ. No. 53966. Second Dist., Div. Five. Apr. 2, 1979.]

JOSEPH L. ENFIELD et al., Plaintiffs and Appellants, v.
ROBERT W. HUNT et al., Defendants and Respondents.

418

---

**COUNSEL**

Kelly & Graham, Terence J. Mix and Robert D. Bohl for Plaintiffs and Appellants.

Bonne, Jones, Bridges, Mueller & O'Keefe, Buck, Molony, Nimmo & Ammirato and Mark D. Rutter for Defendants and Respondents.

---

**OPINION**

**ASHBY, J.**—In this medical malpractice action plaintiffs Joseph and Claire Enfield appeal from a summary judgment in favor of defendants Drs. Hunt, Hirabayashi, and Mannis which was granted on the theory that plaintiffs' first amended complaint, depositions, and answers to interrogatories establish as a matter of law that the claim is barred by the statute of limitations. Defendants contend the action was filed more than "one year after the plaintiff discover[ed], or through the use of reasonable diligence should have discovered, the injury . . . ." (Code Civ. Proc., § 340.5; *Sanchez v. South Hoover Hospital,* 18 Cal.3d 93, 96-97 [132 Cal.Rptr. 657, 553 P.2d 1129].)

We preface our statement of facts with a brief statement of the governing legal principles. In a suit for medical malpractice the one-year statute of limitations commences to run when the plaintiff discovers the injury *and its negligent cause* or through the exercise of reasonable diligence should have discovered them. (*Sanchez v. South Hoover Hospital, supra*; *Whitfield v. Roth,* 10 Cal.3d 874, 885 [112 Cal.Rptr. 540, 519 P.2d 588]; *Wozniak v. Peninsula Hospital,* 1 Cal.App.3d 716, 722 [82 Cal.Rptr. 84].)

When there has been a belated discovery of the cause of action, the issue whether the plaintiff exercised reasonable diligence is a question of fact for the court or jury to decide. The drastic remedy of summary judgment may not be granted unless reasonable minds can draw only one

conclusion from the evidence. (*Wozniak* v. *Peninsula Hospital, supra,* at p. 725; see *Dujardin* v. *Ventura County Gen. Hosp.,* 69 Cal.App.3d 350, 356 [138 Cal.Rptr. 20] (demurrer).)

The motions for summary judgment were submitted upon the pleadings, depositions, answers to interrogatories, and the opposing declarations of the attorneys for defendants and the attorney for plaintiffs. The facts may be stated chronologically as follows: On June 22, 1972, plaintiff Joseph Enfield (hereinafter plaintiff) injured his back, apparently in connection with his employment as supervisor of the DC-10 operations at Continental Airlines. On April 26, 1973, defendants Hunt, Hirabayashi, and Mannis performed an operation on plaintiff's back for a ruptured lumbar intervertebral disc. Immediately after the surgery, plaintiff became aware of a paralysis in his right foot which did not exist prior to the surgery.

In May 1973 Dr. Hunt noted that plaintiff's sensation seemed to be improving and that there was minimal motion of the toes. Plaintiff asked Drs. Hunt and Hirabayashi when his foot would return to normal and was repeatedly told that it would be a very long time.

Plaintiff remained in Dr. Hunt's care through August 1974. Within six months after the surgery, plaintiff "entertained [the] thought" that the surgery had not turned out as Dr. Hunt had indicated, but plaintiff did not "wish to dwell" on it. However, plaintiff "wouldn't dare draw [the] conclusion . . . that possibly something had gone wrong in Dr. Hunt's surgery" without seeing somebody else. He asked Dr. Hunt to let him see a neurosurgeon.

Apparently continuing to improve, plaintiff returned to work in January 1974. He consulted a neurosurgeon, Dr. Krell. Dr. Krell concluded that there was nerve damage but he could not tell its extent. Dr. Krell indicated in February 1974 that plaintiff's condition was not permanent, that the nerves grow at about one inch per month, that another year may be necessary for the nerves to completely regenerate, and that it was possible they would not repair themselves totally. Plaintiff had no reason to believe the nerve damage was caused by anything other than the operation. Dr. Krell was not critical of Dr. Hunt.

In May 1974 Dr. Hunt noted an increase in the strength of the muscles of plaintiff's right leg.

Throughout the period from the operation until August 1974 Dr. Hunt represented to plaintiff that he would fully recover but that it would take a long time. Plaintiff believed and relied upon these representations.

On June 19, 1974, Dr. Hunt wrote a letter to the workers' compensation insurance carrier expressing the opinion that plaintiff's strength on the right foot was gradually and progressively increasing with the course of time and that plaintiff's condition was not yet permanent and stationary. In July 1974 Dr. Hunt noted increasing strength in the right foot and that plaintiff was able to walk and stand for longer periods of time with less pain and discomfort and that plaintiff continued to work full time.

After August 21, 1974, plaintiff stopped seeing Dr. Hunt because whenever plaintiff would ask Dr. Hunt when his foot would return to normal, Dr. Hunt would only say, "All I can tell you, it's going to be a long time."

On September 12, 1974, plaintiff met with his workers' compensation attorney, Lowell Graham. Graham was also a member of plaintiff's church and plaintiff had faith in him. Plaintiff wanted to see what the attorney thought about his situation. It had crossed plaintiff's mind that Dr. Hunt had treated him improperly, but plaintiff "didn't want to prejudge anybody." Graham invited Attorney Terrence Mix to sit in. They discussed the matter for one and a half hours. No determination of the merits was made and no retainer agreement was entered. Plaintiff filled out forms authorizing the attorney to obtain medical records.

On October 21, 1974, Attorney Mix requested medical records from the offices of Dr. Hunt, Dr. Krell, South Bay Hospital, Sepulveda Medical Clinic, and Continental Airlines. Only Continental and South Bay Hospital complied with the request. In late November or December of 1974, Attorney Mix reviewed those medical records. The report of the operation and all other records from the hospital "failed to disclose any difficulties, complications or problems that developed during surgery" and stated that the patient left the operating room in good condition. The records from Continental Airlines contained reports by Dr. Hunt, including the reports of May 23, 1973, May 7, 1974, and July 25, 1974, each of which noted some improvement in plaintiff's condition.

In January or February of 1975, Attorney Mix consulted with an orthopedic surgeon to evaluate the liability of the case.[1] The consultant

---

[1]Pursuant to agreement between the consultant and the attorney, the consultant remained anonymous.

told Mix "that although not commonplace, injuries to the nerve roots can occur during a surgery such as Mr. Enfield underwent and that temporary paralysis can occur even in the presence of reasonable care on the part of the surgeon. Said consultant made clear that only if permanent injury occurred from the surgery, would we have a meritorious case against the surgeon."

Shortly thereafter Attorney Mix conferred with plaintiff. Plaintiff indicated that although he still had paralysis he was also still experiencing some improvement in his overall condition, and plaintiff related that defendants had indicated that he should probably fully recover but that it would take a long time. Attorney Mix then advised plaintiff to notify him as soon as any doctor indicated that his condition was permanent.

On August 25, 1975, in connection with plaintiff's workers' compensation case, Dr. Marvin Meyers concluded that plaintiff's condition was permanent and stationary and that he would never recover. He stated, "[I]t is doubtful that there will be improvement and he will probably need some dorsal assist in the right foot permanently."

In November or December of 1975, plaintiff reviewed Dr. Meyers' report with Attorney Mix. In early 1976 Attorney Mix submitted the records to another consultant, orthopedic surgeon Jon Whisler, who advised the attorney on June 8, 1976, "that because of the permanency of the injury, plaintiff had a meritorious case against the physicians that performed the operation."

On July 2, 1976, plaintiff filed the complaint in this case.

### DISCUSSION

██ Plaintiff contends that the trial court erred in granting summary judgment, because a trier of fact could reasonably conclude that plaintiff exercised due diligence but nevertheless did not discover the negligent cause of his injury until August 25, 1975, and that the complaint filed on July 2, 1976, was therefore within the period of the one-year statute of limitations. We agree.

The period between the operation and August 21, 1974, is not significant since plaintiff was still under defendants' care and defendants were repeatedly assuring him that the condition would eventually correct

itself. ■ During the continuance of this professional relationship. which is fiduciary in nature, the degree of diligence required of the patient in ferreting out and learning of the negligent causes of his condition is diminished. (*Sanchez* v. *South Hoover Hospital, supra,* 18 Cal.3d 93, 102; *Stafford* v. *Shultz,* 42 Cal.2d 767, 777-778 [270 P.2d 1].)

Defendants contend that the statute of limitations began to run at least by September 1974 when plaintiff actually consulted an attorney. This is not determinative. The ultimate question is whether plaintiff and his attorney were diligent. (*Whitfield* v. *Roth, supra,* 10 Cal.3d at pp. 888-889.) In *Whitfield* the issue was whether the plaintiff had exercised reasonable diligence to discover negligence of county doctors in failing to discover or diagnose a brain tumor in the fall of 1963. When the brain tumor was actually discovered by other doctors in July of 1964. plaintiff, believing there may have been malpractice, attempted to obtain an attorney but was unsuccessful until February of 1965. The attorney filed suit in March 1965 and during discovery procedures obtained damaging evidence against the county that a doctor had tentatively diagnosed the brain tumor in October 1963 and that no one had followed up on it. Thereafter a claim was filed with the county and the issue was when the cause of action accrued for purposes of the claims statute.

The court said that the statute did not commence to run in July 1964 when the brain tumor was discovered because the plaintiff still did not know at that time (1) whether the tumor was detectable nine months earlier; (2) whether the county was negligent in failing to detect it earlier; (3) whether the county did detect it earlier and failed to pursue that diagnosis; (4) whether the county detected the condition but decided not to reveal it; or (5) whether the failure to detect it earlier contributed to the side effects suffered when it was surgically removed. (*Id.,* at p. 887.) The court said that plaintiff's efforts to obtain an attorney did not necessarily commence the running of the statute because "[i]n no way did these efforts increase her knowledge of facts constituting the negligent cause of the injury." (*Id.,* at p. 888.) When she finally did obtain an attorney, he was unable "to assemble sufficient proof of the claimed malpractice" until the damaging report came to light in October 1965. (*Id.,* at pp. 888-889.) The court concluded that the plaintiff and her attorney were reasonably diligent but did not discover the negligent cause of the injury until October 1965, and therefore the court reversed a nonsuit which had been granted against the plaintiff on the basis of the claims statute. (*Id.,* at p. 889.)

■ The instant case is similar to *Whitfield*. The investigation conducted by the attorney did not disclose negligence on the part of defendants. The hospital surgery report indicated nothing improper occurred during the surgery. The available reports indicated that plaintiff's condition was gradually improving as defendants had told him it would. The orthopedic surgeon consulted by the attorney stated that temporary paralysis could occur in an operation of this type even with the exercise of reasonable care by the surgeon and expressed the opinion that no meritorious case could be made against the surgeon unless and until plaintiff's condition became permanent. Plaintiff's condition at that time was not permanent but was continuing to improve. The attorney advised plaintiff to let him know when any doctor determined his condition was permanent, and plaintiff did so after Dr. Meyers reached such a conclusion in his workers' compensation report of August 25, 1975. The subsequent consultation by the attorney with Dr. Whisler confirmed the theory that because the condition was now permanent a malpractice case could be made out. The complaint was filed within a year of Dr. Meyers' report indicating for the first time that plaintiff's condition was permanent.

A trier of fact could reasonably conclude that plaintiff and his attorney exercised due diligence and did what reasonably could be expected of them. Prior to Dr. Meyers' August 1975 report, the evidence available to plaintiff and his attorney indicated plaintiff would have a weak or unmeritorious case. It would be contrary to public policy to reach a result in this case which would in effect require an attorney to file a malpractice action at a time when the evidence available to the attorney indicates the action has no merit. (See *Jones v. Queen of the Valley Hospital,* 90 Cal.App.3d 700, 703 [153 Cal.Rptr. 662]; Code Civ. Proc., § 411.30, effective Jan. 1, 1979.)

Defendants argue that whether plaintiff believed his injury to be temporary or permanent is of no significance in determining whether there was negligence at the time of the operation. The advice received by plaintiff and his attorney was to the contrary, that temporary paralysis, although not common, could occur with the exercise of reasonable care but that no meritorious case could be made out until the condition became permanent. This distinguishes the instant case from *Tell v. Taylor,* 191 Cal.App.2d 266, 270-271 [12 Cal.Rptr. 648], and *DeVault v. Logan,* 223 Cal.App.2d 802, 809 [36 Cal.Rptr. 145], cited by defendants, where the malpractice of the original doctors was apparent immediately

upon a second diagnosis by other doctors, and did not depend upon whether the condition healed permanently.

The instant case is more analogous to *Wozniak* v. *Peninsula Hospital, supra.* While undergoing an operation in August 1965 to correct a crossed eye, the patient suffered cardiac arrest and brain and nerve damage which interfered with use of her legs. Reversing a summary judgment for the defense, the court pointed out that although the patient's condition was apparent immediately after the operation the record did not establish a connection between that condition and malpractice during the operation. One of the factors relied upon by the court in finding diligence was that at the time of the patient's discharge from defendant's care, it was believed her legs could be worked back into condition through therapy. (1 Cal.App.3d at p. 725.)

Defendants argue that plaintiff should have been on notice sooner that his condition was not "temporary," since it had existed for 20 or 21 months when the attorney consulted an orthopedic surgeon in January or February of 1975. But plaintiff's condition had continued to improve gradually and was still improving at that time. Defendants also argue that the consultant's opinion that temporary paralysis was "not commonplace" showed there likely was negligence. But the same consultant told the attorney that only if the injury were permanent would there be a meritorious case.

We conclude that reasonable minds could differ on whether the evidence shows reasonable diligence by plaintiff, and therefore the trial court erred in granting summary judgment.[2]

The judgment is reversed.

Kaus, P. J., and Hastings, J., concurred.

---

[2]This conclusion makes it unnecessary to discuss plaintiff's second contention that the court should have granted a continuance for further discovery before ruling on the motions for summary judgment.