[No. B002774. Second Dist., Div. Four. Nov. 2, 1984.]

JOSEPH L. ENFIELD et al., Plaintiffs and Appellants, v.
ROBERT W. HUNT et al., Defendants and Respondents.

COUNSEL

Kelly & Graham and Terence J. Mix for Plaintiffs and Appellants.

Bonne, Jones, Bridges, Mueller & O'Keefe, Dennis Wojs, Christopher B. Marshall, Buck, Molony & Ammirato, Mark D. Rutter and James M. Cox for Defendants and Respondents.

OPINION

**WOODS, P. J.**—Joseph and Claire Enfield appeal from a judgment, entered after a court trial, in favor of respondents Hunt, Hirabayashi, and Mannis. The sole issue at trial was whether appellants' cause of action for medical malpractice was barred by the statute of limitations.

We affirm the judgment.

In April 1973, appellant was hospitalized due to a back injury he had received at work almost a year earlier. In discussing whether surgery was indicated, appellant's physician, Dr. Hunt, said that if appellant elected to have surgery, there was a 70 percent chance he would improve, a 30 percent chance he would remain the same, and no way that he would be made worse by the surgery. This assurance was a factor in appellant's decision to have surgery.

On April 26, 1973, a lumbar laminectomy and fusion were performed. The morning after surgery, appellant could not move his toes. There were complications with his right foot and leg, bowel, and bladder. He had no feeling in his right leg and foot.

In postsurgical physical therapy, he overheard a therapist say: "[W]e better get this thing moving pretty soon or we are going to lose the leg." He also overheard a therapist saying that Dr. Hunt ordered the wrong kind of brace for his foot. While in the hospital, appellant asked Dr. Hirabayashi how long his foot would be that way. The doctor replied: "[W]ell, Joe, it will be about six weeks or it will be a long time."

Appellant testified that he left the hospital in a foot brace; his right foot was "totally unusable." He felt he was "a mess"; he knew he was in worse shape than when he entered the hospital, but felt he needed a positive attitude to recover. Appellant did not ask his doctors the cause of his foot problem. A few months after the operation, Dr. Hunt said "something like, don't worry, Joe, it is just going to be a long time. But [Dr. Hunt] was optimistic and [Enfield] felt good."

In January 1974, Dr. Hunt referred appellant to Dr. Douthett. Appellant had an opportunity to ask Dr. Douthett's opinion as to the cause of his foot problem but did not recall doing so.

In February 1974, Pat Gould, a Continental employee who handled workers' compensation claims, told appellant he had the worst case of foot drop she had ever seen. Appellant thought this was a "two-for-a-nickel" remark, and that he only needed her advice for workers' compensation.

Appellant asked Dr. Hunt to send him to a neurosurgeon on more than one occasion because he felt something was dreadfully wrong.

In February 1974, Continental Insurance Company sent appellant to Dr. Krell, a neurosurgeon, because of pain in appellant's right leg and foot. Appellant could not recall availing himself of the opportunity to ask Dr. Krell what had caused his foot drop. Nevertheless, Dr. Krell told appellant that the cause was nerve damage; he did not, however, know the extent of the nerve damage. "He said depending on how extensive it was, since nerves regenerate at approximately one inch a month, that he didn't know how long it would take, but it had been a year since my surgery, so that it would be at least another year [before the nerve would regenerate]."[1]

Appellant testified that after learning he had nerve damage, he felt it was a reasonable conclusion that Dr. Hunt's surgery had caused the injury, but he did not believe the damage was due to negligence.

Appellant felt his condition would improve, and he felt that it did. His pain diminished; the leg gained some muscle tone. His right toes started to work.

In August 1974, appellant stopped seeing Dr. Hunt because he had "lost confidence" in him. He testified that the basis for this lost confidence was the length of time he had to wait in Dr. Hunt's office. Since Dr. Krell was closer, and he only needed one doctor, he chose Dr. Krell.

On September 12, 1974, appellants consulted an attorney, Mr. Graham, about their marital problems and Mr. Enfield's workers' compensation claim. Apparently Mr. Graham called in another attorney, Mr. Mix. Appellant stated that nothing was said about medical malpractice, but he did sign several authorizations. He did not recall the whole conversation with the attorneys, but there "could have been" discussion about the foot drop problem and a conversation about suing Dr. Hunt "could have taken place."

---

[1]An EMG test in May 1974, showed complete absence of nerve function.

After the meeting, appellant considered suing Dr. Hunt, but said that decision was not based on any information he got at that meeting.

At the time that appellant saw the attorneys, he had constant pain in his right foot and frequent pain in his right leg, lower back and buttocks. He had extreme loss of sensation and extreme loss of control of his right foot, and utilized a device to allow him to walk. His complaints were the same at the time of trial.

In August 1975, Continental referred appellant to Dr. Meyers. In October 1975, he saw a report by Dr. Meyers which stated that his foot was never going to improve. He stated that he always felt he would fully recover until he read that report. After receiving the Meyers report, appellant spoke to the attorneys he had consulted in September 1974.

Appellant testified that there was no communication between him and his attorneys from September 1974 until October 1975. In initiating the second meeting with the attorneys, appellant testified that he had not relied upon anything the attorneys had said to him.

On July 2, 1976, appellants filed a complaint for medical negligence against respondents. A first amended complaint was filed a year later. Respondents' motion for summary judgment was granted in October 1977.

Appellants challenged the summary judgment and obtained a reversal from the Second District (Div. 5). *Enfield* v. *Hunt* (1979) 91 Cal.App.3d 417, 423 [154 Cal.Rptr. 146] (hereafter *Enfield I*) held that a triable issue of material fact existed as to whether the evidence showed reasonable diligence by Mr. Enfield.

Upon remand, the case was bifurcated on the statute of limitations issue, and a jury trial was waived.

The court heard testimony from Mr. Enfield and excluded testimony from Mr. Mix, the attorney, as irrelevant.

The court found that appellants' cause of action was barred by the statute of limitations, and judgment was entered for respondents. Appellants' motion for a new trial was denied; their appeal was timely filed.

Appellant makes a law of the case argument that *Enfield I* established the admissibility of his attorney's testimony as to the merits of the potential malpractice action, specifically on the issue of when the statute of limitations began to run on the malpractice action; and that the admissibility of

this testimony is not dependent upon a showing that the appellant relied upon it.[2]

Respondents contend that the attorney's testimony was properly excluded because *Enfield I* merely established that there was a triable issue of fact as to diligence and substantial evidence had been introduced to support the trial court's finding that the statute of limitations had run before appellant consulted the attorney and therefore the attorney's testimony was not relevant.

I

We reject appellant's contention that *Enfield I* mandates the admissibility of Mr. Mix's testimony. The purpose of his testimony was to establish his belief that only permanent nerve damage would indicate negligence by respondents, and that appellant had been advised by legal and medical experts to wait until it was established that the condition was not temporary.[3]

The *Enfield I* court did not direct the trial court to admit the attorney's testimony or any other post-September 1974 evidence. *Enfield I* simply enunciated the basis for its conclusion that a triable issue of fact existed as to whether appellant had exercised due diligence in bringing the action.

*Enfield I* reversed summary judgment for defendants because reasonable minds could draw more than one conclusion from the documentary evidence which had been submitted.[4] (*Enfield* v. *Hunt, supra,* 91 Cal.App.3d at pp. 419-420, 425.) That evidence differed, however, from the evidence adduced at trial.

---

[2]Mr. Mix intended to testify to a conversation he had with an anonymous medical consultant relating the consultant's medical opinion that you could not determine whether or not malpractice had occurred in this situation until the condition became permanent. Mr. Mix's declaration indicates that under the testimony he describes as his "state of mind" his diligence in investigating appellant's case is demonstrated.

[3]His offer of proof to this effect was rejected.

[4]That evidence alleged that appellant believed and relied upon Dr. Hunt's representations that he would fully recover, but it would take a long time. It also established that in June 1984, Dr. Hunt's report to the workers' compensation carrier included his opinion that the foot was improving, and the condition was not permanent and stationary. (*Enfield* v. *Hunt, supra,* 91 Cal.App.3d at p. 421.) The evidence on summary judgment also showed that Mr. Mix received medical records in October 1974, and found no evidence of problems during the surgery (*ibid.*), and that based upon consultation with his medical consultant, Mr. Mix told appellant that temporary paralysis could occur in this type of surgery even with reasonable care on the part of the surgeon. The consultant indicated that only if the paralysis were permanent would a meritorious action exist. (*Id.,* at p. 422.) That Mr. Mix advised appellant to notify him as soon as a doctor indicated the condition was permanent, which appellant did after seeing Dr. Meyers' report in 1975. (*Ibid.*)

*Enfield I* began its analysis by citing us to the rule that: "In a suit for medical malpractice the one-year statute of limitations commences to run when the plaintiff discovers the injury *and its negligent cause* or through the exercise of reasonable diligence should have discovered them. [Citations.]" (*Enfield* v. *Hunt, supra,* 91 Cal.App.3d at p. 419.)

The court reasoned: "The period between the operation and August 21, 1974, is not significant since plaintiff was still under defendants' care and defendants were repeatedly assuring him that the condition would eventually correct itself. During the continuance of this professional relationship, which is fiduciary in nature, the degree of diligence required of the patient in ferreting out and learning of the negligent causes of his condition is diminished. [Citation.]" (*Enfield* v. *Hunt, supra,* 91 Cal.App.3d at pp. 422-423.)

There is nothing in the reasoning of *Enfield I* that indicates, as a matter of law, that the statute did not run while appellant was under the care of Dr. Hunt. The fact that the degree of diligence required is diminished during the continuance of the professional relationship does not mean it is extinguished.

■ The trial court found that the statute had run before appellant consulted his attorneys. There is substantial evidence in the record to support that conclusion. Appellant had an opportunity to ask each of the doctors he consulted the cause of his injury, but he did not do so. He was told before surgery there was *no* chance he would be worse after the operation. He was, unhappily, dramatically worse. The severity and duration of his symptoms were sufficient to put him on notice to inquire. (Cf. *McGee* v. *Weinberg* (1979) 97 Cal.App.3d 798, 804 [159 Cal.Rptr. 86].) Yet, he failed to do so.

The appellate court in *Enfield I* believed that the evidence would show that appellant's doctor was constantly reassuring him and that under these circumstances appellant's lack of diligence was justified. The trial court did not so find. The trial court found that appellant was "an eternal optimist" who did not meet the standard of a reasonable man. This finding is based upon well established legal principle. ■ "Possession of 'presumptive' as well as 'actual' knowledge will commence the running of the statute. The applicable principle has been expressed as follows: 'when the plaintiff has notice or information of circumstances to put a reasonable person *on inquiry,* or *has the opportunity to obtain knowledge* from sources open to his investigation . . . the statute commences to run.'" (*Sanchez* v. *South Hoover Hospital* (1976) 18 Cal.3d 93, 101 [132 Cal.Rptr. 657, 553 P.2d 1129], quoting 2 Witkin, Cal. Procedure (2d ed. 1970) Actions, § 339, p. 1181.)

██ In support of his contention that *Enfield I* mandates admission of the attorney's testimony, appellant relies on the following language of the *Enfield I* court: "Defendants contend that the statute of limitations began to run at least by September 1974 when plaintiff actually consulted an attorney. This is not determinative. The ultimate question is whether plaintiff and his attorney were diligent. [Citation.]" (*Enfield* v. *Hunt, supra,* 91 Cal.App.3d at p. 423.) The court was addressing respondents' contention that at the very latest the statute ran when appellant consulted the attorney, and therefore the subsequent diligence of his attorney was irrelevant.

In saying that consulting an attorney is not always determinative of the issue, the court did not foreclose a finding that the statute had already run or mandate admission of the attorney's testimony.

The final paragraph of the *Enfield I* opinion states: "We conclude that reasonable minds could differ on whether the evidence shows reasonable diligence by the plaintiff. . . ." (*Enfield* v. *Hunt, supra,* 91 Cal.App.3d at p. 425.) That was all the court was required to determine. We reject the law of the case argument as the basis for admitting Mr. Mix's testimony.

II

Mr. Mix's declaration in support of the motion for new trial states that he communicated to the appellant the fact that the anonymous doctor believed that it could not be determined whether he had a malpractice action until his condition became permanent. Appellant denies that he ever spoke to the attorney between their initial meeting and his unsolicited telephone call following receipt of Dr. Meyers' medical report. Appellant therefore could not have known of any legal theory that a malpractice action could not be established in his case until his condition became permanent.

Appellant argues that Mr. Mix's testimony was relevant regardless of appellant's state of mind. Appellant contends that even if he had consulted an attorney or doctor earlier, no sources of knowledge were available from which he could have learned the negligent cause of his injury. Appellant argues that whatever his subjective state of mind he could not objectively have known he was negligently injured any sooner than he did, and this objective standard is determinative of the statute of limitations issue.

Firstly, there is no medical evidence before the court establishing that a determination of malpractice could not have been made sooner. The testimony of Mr. Mix as to the anonymous doctor's opinion could have been admitted to show Mr. Mix's state of mind but not for its medical truth. No other medical evidence was introduced by appellant in support of this con-

tention. ■ However, assuming arguendo that appellant would have been unable to establish a meritorious cause of action or to know the negligent cause of the injury until October 1975, when he read Dr. Meyers' report, he still was not relieved of the duty to exercise due diligence. The circumstances surrounding his injury put him on notice to inquire. (*Sanchez* v. *South Hoover Hospital, supra,* 18 Cal.3d at p. 101.) Even had such inquiry been fruitless, his diligence in making the inquiry would have protected his rights. It would not have been necessary for him to file a premature complaint. (See *Whitfield* v. *Roth* (1974) 10 Cal.3d 874, 889 [112 Cal.Rptr. 540, 519 P.2d 588]; *Jones* v. *Queen of the Valley Hospital* (1979) 90 Cal.App.3d 700, 703 [153 Cal.Rptr. 662].)

■ Discovery that one has a viable cause of action does not cause the statute to run; "it is the knowledge of facts rather than discovery of legal theory, that is the test." (Cf. *McGee* v. *Weisberg, supra,* 97 Cal.App.3d at p. 803.) "Most people do not know the legal answers to questions arising from certain circumstances. However, facts and events which inform a person that something is wrong, or should be looked into, are usually recognizable by the ordinary person. One example is pain. . . . It is the occurrence of some such cognizable event rather than knowledge of its legal significance that starts the running of the statute of limitations." (*Id.,* at p. 804.)

■ Here, the court found that the statute ran when appellant failed to make adequate efforts to protect his own rights within a year of being put on notice that he needed such protection. He was aware of his own pain and paralysis, and that he was worse than before the surgery despite Dr. Hunt's assurance to the contrary.

The test is not whether this court would have reached the same conclusion but whether substantial evidence supports the trial court's conclusion that appellant failed to exercise due diligence within a year of being put on notice to inquire.

### III

We have already indicated our disagreement with appellant's contention that the trial court's finding encourages the filing of nonmeritorious lawsuits. In the several cases cited by appellant in support of this contention, the plaintiffs were diligent but could not determine the negligent cause of their injuries. (*Whitfield* v. *Roth, supra,* 10 Cal.3d at p. 888; *Jones* v. *Queen of the Valley Hospital, supra,* 90 Cal.App.3d at p. 703.) These causes of action were preserved by the plaintiffs' diligence in pursuing them.

Unfortunately, appellant herein did not exercise the same degree of diligence.

The judgment is affirmed.

McClosky, J., and Arguelles, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied January 16, 1985.