**CALIFORNIA SANSOME CO., a limited partnership, and Polk Market Co., a limited partnership, Plaintiffs,**

v.

**UNITED STATES GYPSUM COMPANY, a Delaware corporation, and W.R. Grace & Co.–Conn., a Connecticut corporation, Defendants.**

**No. C–89–1387 EFL.**

United States District Court, N.D. California.

April 19, 1993.

Kenneth B. McClain, Humphrey, Farrington & McClain, Independence, MO, Joseph A. Darrell, Thelen, Marrin, Johnson & Bridges, San Francisco, CA, John M. Klamann, Overland Park, KS, for plaintiffs.

James J. Brosnahan, Morrison & Foerster, William M. Armstrong, McCutchen, Doyle, Brown & Enersen, San Francisco, CA, James D. Pagliaro, Morgan, Lewis & Bockius, Philadelphia, PA, for defendants.

## ORDER GRANTING JUDGMENT NOTWITHSTANDING THE VERDICT

LYNCH, District Judge.

### I. *Background*

Plaintiffs filed this tort action against defendants on April 21, 1989, claiming asbestos-related damage in two of their buildings—425 California Street and Fox Plaza. Plaintiffs sought upwards of 20 million dollars in compensatory and punitive damages to recoup costs for analysis, removal, and replacement of asbestos-contaminated property, as well as for loss of use of the buildings.

All parties agreed that a three-year statute of limitations applied to plaintiffs' action. Defendants made several motions: first, a motion to dismiss and, later, a motion for summary judgment contending that plaintiffs' action was barred by the applicable statute of limitations. Defendants argued that, as a matter of law, plaintiffs knew or should have known of the injury to their buildings about the time of construction in

1968, or, alternatively, that plaintiffs were put on inquiry notice of their claims well before April 1986 through their own investigations plus numerous articles, publications, governmental regulations and seminars concerning the potential hazards of asbestos. Plaintiffs responded that they did not know that asbestos-related damage existed in their buildings until September of 1986, when they were informed by an industrial hygienist they had hired that a test showed the asbestos in their buildings exceeded the regulatory limits. Plaintiffs also denied that any articles, seminars, etc., effectively put them on inquiry notice prior to April 1986 that their buildings contained asbestos fireproofing and that the fireproofing was releasing hazardous levels of asbestos.

Defendants' motion for summary judgment was heard in this Court on August 31, 1990. The Court agreed with defendants that plaintiffs' warranty claims were barred by the statute of limitations. However, the Court denied defendants' motion for summary judgment on the remainder of plaintiffs' claims. Although the Court found that defendants had presented a strong case, it concluded that whether plaintiffs were on inquiry notice was a material issue of disputed fact.

The Court bifurcated the remaining proceedings, setting the statute of limitations issue for trial in February 1991. Following a jury trial, the jury returned a verdict in favor of plaintiffs on the statute of limitations question. During the pendency of further proceedings on the merits, allegations of impropriety on the part of plaintiffs' counsel in his failure to produce during discovery certain non-privileged documents, came to the attention of the Court. After allowing each side an opportunity to brief the implications of this development, the Court on February 4, 1991 ordered a new trial on the statute of limitations issue.

The statute of limitations question was tried before a jury for a second time in September 1992. Again the jury returned a verdict in favor of plaintiffs. Again defendants filed post-trial motions requesting a new trial or judgment notwithstanding the verdict. After considering the post-trial briefs of all the parties, the Court heard oral argument on the post-trial motions. Without clearly expressing its inclination on defendants' post-trial motions at the hearing, the Court indicated that additional briefing on defendants' motion for judgment notwithstanding the verdict might be helpful, and the Court invited each side to submit a single supplemental brief. Having fully considered the respective positions of the parties, including each side's supplemental post-trial briefs, the Court finds that defendants are indeed entitled to judgment notwithstanding the verdict, and the Court will therefore enter judgment in favor of defendants.

## II. California's "Discovery Rule"

■ The parties agree that a three-year statute of limitations applies in this case. The ultimate question, upon which the timeliness of plaintiffs' suit depends, is the question of when plaintiffs' cause of action accrued. This question is answered by reference to California's "discovery rule." The "discovery rule," which protects injured plaintiffs who, through no fault of their own, are ignorant of their injuries, provides a category of exceptions in cases where a statutory time bar might otherwise apply.

The standard for a discovery exception to a statute of limitations bar is well-established under California law. A plaintiff's claims are deemed to have accrued for purposes of the running of the applicable statute of limitations when the plaintiff suspected or should have suspected that it had been injured and that the injury was the result of wrongdoing—or, in other words, when the plaintiff had notice of information sufficient to put a reasonable person on inquiry. *Jolly v. Eli Lilly & Co.*, 44 Cal.3d 1103, 1110–11, 1114, 245 Cal.Rptr. 658, 751 P.2d 923 (1988); *Gutierrez v. Mofid*, 39 Cal.3d 892, 896–97, 218 Cal.Rptr. 313, 705 P.2d 886 (1985); *Miller v. Bechtel Corp.*, 33 Cal.3d 868, 873, 875, 191 Cal.Rptr. 619, 663 P.2d 177 (1983).

■ The "on inquiry," "suspicion" standard applies both to discovery of the fact of injury and its wrongful cause.[1] *Sanchez v.*

1. Although some unexplained language in the    *Jolly* decision may indicate otherwise, *see Jolly,*

*South Hoover Hospital,* 18 Cal.3d 93, 99, 132 Cal.Rptr. 657, 553 P.2d 1129 (1976); *Gutierrez v. Mofid,* 39 Cal.3d at 896, 218 Cal.Rptr. 313, 705 P.2d 886. Thus in *Miller v. Bechtel Corp., supra,* where the injury at issue was a voluntary marital dissolution settlement entered into by a party unaware of the true value of certain assets subject to the settlement, the cause of action accrued when plaintiff "became aware of facts which would make a reasonably prudent person suspicious." Plaintiff in *Miller,* who at the time of her marital dissolution settlement had "doubts" about the stated value of certain stock subject to the settlement, was held to be time barred although she did not realize the actual fact of her injury (substantial undervaluation of the stock she waived her interest in) until years later. *Accord Jolly v. Eli Lilly & Co.,* 44 Cal.3d at 1111, 245 Cal. Rptr. 658, 751 P.2d 923.

The aspect of the "discovery rule" which is the subject of fierce debate with respect to defendants' pending motion involves the special context where a plaintiff becomes aware of facts giving it objective reason to be suspicious, begins its investigation of the facts pertaining to its possible claim, and ultimately discovers the fact and wrongful cause of its injury within three years (the statutory period in this case) of its suspicion, but fails to file suit within that three-year period.

■ Although certain decisions of the California appellate courts provide grist for a heated debate, this Court has little difficulty discerning what the California Supreme Court would decide in this case. The limitations period began to run on the plaintiffs at the point of "suspicion," at the point when plaintiffs were first put "on inquiry," despite the fact that additional time may reasonably have been necessary to actually conduct the inquiry and confirm the suspicions. Because plaintiffs were indeed able to confirm their suspicions within three years of the time they were first put "on inquiry," there can be no

doubt in this case that their failure to file suit within three years of their suspicion bars them from recovery.

■ In *Gutierrez* and *Sanchez*—earlier decisions cited with approval in the California Supreme Court's most recent pronouncement on the "discovery rule" in *Jolly*—the California Supreme Court set forth a clear standard to determine when a plaintiff should be deemed to be "on inquiry." A plaintiff is "on inquiry," and the statute of limitations begins to run, when a plaintiff's " 'reasonably founded suspicions [have been aroused],' and she has actually 'become alerted to the necessity for investigation and pursuit of her remedies....' " *Gutierrez,* 39 Cal.3d at 897, 218 Cal.Rptr. 313, 705 P.2d 886 (quoting *Sanchez,* 18 Cal.3d at 102, 132 Cal.Rptr. 657, 553 P.2d 1129).

The California Supreme Court reaffirmed this statement of the discovery rule in *Jolly,* its most recent "discovery rule" case. There the California Supreme Court observed:

> *Once the plaintiff has a suspicion of wrongdoing,* and therefore an incentive to sue, *she must decide whether to file suit* or sit on her rights. So long as suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her.

*Jolly,* 44 Cal.3d at 1111, 245 Cal.Rptr. 658, 751 P.2d 923 (emphasis added). The *Jolly* decision unequivocally evinces the California Supreme Court's mandate that the statute of limitations should begin to run at the time of suspicion when a plaintiff is "on inquiry," not just after the plaintiff has actually confirmed its suspicion through its diligent investigation. This interpretation of the "discovery rule" is most consistent with the policies underlying the rule, one of which is to require plaintiffs to diligently pursue their claims. *See id.* at 1112, 245 Cal.Rptr. 658, 751 P.2d 923. And a contrary interpretation would simply collapse the inquiry standard

---

44 Cal.3d at 1112, 245 Cal.Rptr. 658, 751 P.2d 923, this Court, based on the reasoning of *Jolly* and a line of California Supreme Court precedents preceding *Jolly,* has ruled repeatedly that the "suspicion," or "on inquiry" standard applies to the fact of injury, as well as its wrongful cause. The California Supreme Court's decision

in *Miller v. Bechtel Corp.,* which the *Jolly* court leaves wholly intact, is illustrative of the "discovery rule's" clear application to the fact of injury, not just the wrongful cause of injury as some careless wording in the *Jolly* decision might suggest.

into a knowledge standard, which the California courts have clearly rejected.

*Miller, supra,* is illustrative of the California Supreme Court's application of the "discovery rule" in a similar context. There, in 1971 when plaintiff signed the marital dissolution agreement at issue, she had "doubts" as to the actual value of her husband's Bechtel stock. In 1972 and 1973, the plaintiff made unsuccessful inquiries to investigate her doubts. *Id.,* 33 Cal.3d at 872–73, 875, 191 Cal.Rptr. 619, 663 P.2d 177. Plaintiff's complaint alleged that she had no knowledge of the "true value" of the stock until it was sold in 1977. *Id.* at 872, 218 Cal.Rptr. 313, 705 P.2d 886. Suit was brought by plaintiff in 1978. The California Supreme Court held that, despite plaintiff's lack of definite knowledge, the statute began to run in 1971 and 1972 when her suspicions had put her on inquiry notice. *Id.* at 873, 875, 218 Cal.Rptr. 313, 705 P.2d 886. The Court reached its decision over a strong dissent, in which Chief Justice Bird argued that the statute was tolled until plaintiff knew the "true value" of the stock in 1977. *Id.* at 882, 218 Cal.Rptr. 313, 705 P.2d 886. As *Miller* and the plain language of the "discovery rule" make clear, the limitations period commences at the point a plaintiff becomes "alerted to the necessity for investigation," and not when the plaintiff's investigation actually confirms the injury.[2]

Plaintiffs also attempt to bring the case at bar within the ambit of a number of decisions from the California Court of Appeal.[3] The Court wholeheartedly agrees with defendants' argument that the state appellate court cases relied upon by plaintiff are inapposite, in that each presents a factual or legal context readily distinguishable from the context of the case at bar.

### III. Application of the "Discovery Rule" to the Evidence Adduced at Trial

■ Plaintiffs' burden of proof was to establish that, prior to April 21, 1986, they did

---

2. The California courts may recognize an exception to this application of the discovery rule in instances where a plaintiff through his or her diligent inquiry is unable, or would have been unable, to confirm the injury or wrongdoing within the limitations period. *See Whitfield v. Roth,* 10 Cal.3d 874, 112 Cal.Rptr. 540, 519 P.2d 588 (1974); *see also Jolly,* 44 Cal.3d 1103, 1113 n. 11, 245 Cal.Rptr. 658, 751 P.2d 923 (citing *Whitfield,* 10 Cal.3d 874, 887–89, 112 Cal.Rptr. 540, 519 P.2d 588); *Enfield v. Hunt,* 91 Cal. App.3d 417, 154 Cal.Rptr. 146 (1979). This, however, is not such a case. In the instant case plaintiffs were able to confirm their suspicion through reasonably diligent investigation within a matter of months, and well within the three-year period in which they could have timely brought suit.

Nonetheless plaintiffs argue strenuously that, even in the instant case where plaintiffs were able to confirm their suspicions within three years, *Whitfield* starts the limitations period at the time of discovery, not the time of suspicion. Plaintiffs' arguments are unavailing in light of more recent California Supreme Court decisions, and particularly in light of footnote 11 of the *Jolly* decision. To the extent that *Whitfield* conflicts with the California Supreme Court's more recent pronouncements in *Sanchez, Gutierrez, Miller,* and *Jolly,* footnote 11 of the *Jolly* decision indicates that *Whitfield* should be regarded as an exception which applies only in a limited category of cases—cases where a plaintiff may be unable to confirm its suspicions within the statutory period. For the reasons stated above, this case clearly falls outside that category.

3. Plaintiffs rely primarily on the following appellate court decisions: *Leaf v. City of San Mateo,* 104 Cal.App.3d 398, 163 Cal.Rptr. 711 (1980); *Kirby v. Albert D. Seeno Constr. Co.,* 11 Cal.App. 4th 1059, 14 Cal.Rptr.2d 604 (1992); *Enfield v. Hunt,* 91 Cal.App.3d 417, 154 Cal.Rptr. 146 (1979). And in a letter to the Court dated March 10, 1993, which followed the parties' final submission of briefs in this matter, plaintiffs' counsel directs the Court's attention to the *Kirby* case, and argues that the case at bar is unlike other California cases in that "[p]laintiffs had neither knowledge nor notice of injury, and consequently never reached and considered the question of another's wrongdoing."

Plaintiffs' untimely and disingenuous distinction completely ignores the fact that plaintiffs in this case, unlike those in *Kirby* and virtually all other California "discovery rule" cases, consist of a group of sophisticated businessmen who at all times relevant to this lawsuit have earned their livelihoods in the commercial real estate business. They are hardly in a position to compare themselves to the homeowner plaintiffs in *Kirby,* or the medical malpractice patients in numerous other "discovery rule" cases. The Court finds almost incredulous plaintiffs' formalistic argument which seeks to dissect the injury prong from the wrongdoing prong of the "discovery rule." Under the circumstances particular to this case, there can no question that these commercially sophisticated plaintiffs suspected, or at the very least should have suspected, both their injury and its wrongful cause no later than January 1986.

not know of, and should not have suspected or been on inquiry as to, their damage and its wrongful cause. The bulk of plaintiffs' evidence was directed to the issue of whether they knew of their damage prior to April 21, 1986. However, plaintiffs were unable to overcome the compelling evidence that they should have suspected and actually were "on inquiry" as to their alleged damage and its wrongful cause prior to April 21, 1986. Indeed, the evidence produced by plaintiffs almost uniformly supported this conclusion.

First, the uncontroverted evidence established that prior to April 21, 1986 plaintiffs knew that their buildings had asbestos-containing fireproofing. Sixteen years prior to the commencement of this action, Jay Cahill learned that 425 California Street and Fox Plaza had asbestos-containing fireproofing. (RT at 541:22–542:13; 544:6–16). In 1985, Peter Cahill had bulk samples tested from both buildings. Those tests confirmed that asbestos was present in the fireproofing. (RT at 676:2–683:5).

Second, the uncontroverted evidence established that prior to April 21, 1986 plaintiffs knew that asbestos fireproofing was alleged to be a health hazard when it was disturbed during remodeling or maintenance; and they knew that such remodeling and maintenance work had been and would continue to be performed in their buildings. Between 1971 and 1974 Jay Cahill was involved in meetings and received correspondence that discussed the alleged health hazards of asbestos fireproofing. (See Def.Exhs. 15–29). Jay Cahill admitted at trial that in 1973 he was aware of allegations that asbestos products were hazardous. And he read specifically in an article in the Bay Guardian Newspaper that the health of office and maintenance workers was at risk when the fireproofing in his buildings was disturbed. (Pl.Exh. 177). Jay Cahill confirmed his understanding of the alleged health hazards resulting from the disturbance of fireproofing when, in November 1972, he wrote that subcontractors at the Tishman building "who scrap away fireproofing and allow it to fall on the floor are creating a health hazard and a sliding hazard." (Def.Exh. 19).

Prior to April 21, 1986, Gerald Cahill was also intimately familiar with the theory that forms the basis for this lawsuit: that contamination occurs during remodeling and routine maintenance activities. He had read the EPA "Purple Book," which stated that "[w]hen building maintenance, repair, renovation, or other activities disturb ACM, or if it is damaged, asbestos fibers are released creating a potential hazard to building occupants." (Def. Exh. 46, at pg. S–1.; RT at 341:15–342:11). The Cahills knew that maintenance and renovation work had been and would be performed in the plenums on a regular basis. (RT 1001:16–1003:24). Moreover, Gerald acknowledged that he was "concerned" after reading the "Purple Book," and that he thereafter "felt we absolutely needed to do a survey" of the buildings. (RT at 220:7–8). The "Purple Book" together with the other facts known to the plaintiffs alerted the plaintiffs to the necessity for investigation. But there was more. Assertions similar to those made in the "Purple Book" were made at a seminar attended by Gerald Cahill in early February 1986. Most notably, a slide presented there identified "Remodeling/Renovation" among "Activities that release asbestos." (See Def.Exh. 106; RT at 885:24–25; 896:23–897:1; see also Def.Exh. 107 (Gerald's seminar notes listing "routine renovation" as an activity during which you must "Control [ ] the risk")).

Finally, the uncontroverted evidence established that prior to April 21, 1986, plaintiffs suspected their injury and its wrongful cause, and in fact began an investigation based on their suspicions. It was undisputed at trial that prior to April 21, 1986 plaintiffs began to investigate the allegations that the fireproofing in their buildings was a health hazard. In April 1985, Peter Cahill had bulk samples taken from the fireproofing at 425 California Street. Similar samples were taken from Fox Plaza in September 1985. Peter had these samples tested and received the test results showing the presence of asbestos. (RT at 676:2–683:15).

In December 1985 Gerald Cahill spoke with realtors concerning the sale of Fox Plaza. (RT at 350:5–9). The realtors told Gerald that lenders and buyers would want to

know if Fox Plaza contained asbestos. (RT at 215:14–21). After these conversations Gerald "went to the EPA and ... obtained the Purple Book." (RT at 216:18–19). The "Purple Book" instructed Mr. Cahill that it was important to conduct a complete survey of the building.

> After I digested the information in the Purple Book I was concerned and I felt we absolutely needed to do a survey, so we would have the information for the brokers and I discussed this with Richard Cahill and he suggested that I write up what I learned about it and we could have a short meeting to discuss what I was recommending.

(RT at 220:7–12).

On January 10, 1986, Gerald wrote a memo[4] to the family partnerships stating his and Richard's recommendation to proceed with "formal air-testing and [a] building inspection with an A.C.M. testing agency." (P.Exh. 17). By this date, Gerald had already acquired a significant amount of knowledge. In the memo, Gerald writes: (1) that he was "reasonably certain" that the buildings had "friable" asbestos fireproofing; (2) that the fireproofing was "capable of being a hazard to occupants and/or construction workers-maintenance staff;" (3) that the "federal government will no longer lease space in buildings containing any asbestos;" and (4) that institutional investors were shying away from property containing asbestos products which "will impact the sales values of our properties;" and (5) that "removal of A.C.M. is extremely expensive." (*Id.*).

Bill Cahill responded to Gerald's memo by recommending that the investigation be cloaked under the "attorney/client privilege." (Def.Exh. 101). Attorneys were thereafter retained to assist in the investigation. (RT at 235:9–25). The Cahills' investigation continued in February 1986 when Gerald attend-

ed a seminar entitled "Asbestos Update." (RT at 229:8–230:22).

The evidence adduced at trial established in no uncertain terms that plaintiffs suspected, and should have suspected, their injury and its wrongful cause no later than January 1986. Indeed, a jury could not have properly found otherwise. In short, the Court concludes that no reasonable jury, based on the evidence and a rational application of the Court's instructions, could have reached the conclusion which the jury in this case reached. And judgment notwithstanding the verdict is appropriate here, where "the evidence, viewed in a light most favorable to the non-moving party, permits only one reasonable conclusion with respect to the verdict." *Locricchio v. Legal Services Corp.,* 833 F.2d 1352, 1356 (9th Cir.1987).

The Court acknowledges now that it erred in its denial of defendants' request for a directed verdict at the close of all the evidence. Whatever the Court's inclinations may have been at the time of its ruling on defendants' request, upon a judicious review of all the evidence in the trial record in light of the controlling California cases, the Court is able to say now with utmost confidence that no reasonable jury could have decided that plaintiffs were not "on inquiry" prior to April 1986. Accordingly, the Court will grant defendants' request for judgment notwithstanding the verdict.[5]

## IV. *Conclusion*

For the reasons set forth above, the Court hereby GRANTS defendants' motion for judgment notwithstanding the verdict and holds that plaintiffs' claims are time barred. Accordingly, a trial on the merits will not be necessary. This case is hereby DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

April 21, 1986. A copy of the memo is attached to this Order.

---

4. The January 10, 1986, memo, more than any other single piece of evidence, provides compelling proof that plaintiffs were "on inquiry" no later than January 1986. The other evidence adduced at trial failed, in the face of this damning admission, to defuse the import of the memo or otherwise raise a genuine issue of fact regarding whether plaintiffs were "on inquiry" prior to

5. In the alternative, the Court would find the jury's verdict in this case to be "contrary to the clear weight of the evidence." *Murphy v. City of Long Beach,* 914 F.2d 183, 187 (9th Cir.1990).

APPENDIX

CAL 062204

1.

To: John E Cahill Partnership          (confidential)
    Richard F Cahill Partnership
    J. Peter Cahill Partnership
    Vivico c/o Bill Cahill

Re:   ASBESTOS                          1/10/86

Of our buildings, Fox Plaza and 425 California Street are most likely to have friable asbestos containing material capable of being a hazard to occupants and/or construction workers-maintenance staff. We are reasonably certain that the fireproofing contains friable asbestos as well as pipe lagging, plaster ceilings, and some simulated acoustic ceilings. However, without on-site air-testing and a thorough inspection of the buildings, we cannot determine if the asbestos containing material (A.C.M.) is hazardous. 350 Sansome, 550 Kearney, and 155 Montgomery probably have some A.C.M. in lesser amounts. The following points should be considered:

1) Our insurance programs do not cover asbestos contamination - either.

2.

liability or costs of removal & restor-
ation.

2) The federal government will no longer
lease space in buildings containing any
asbestos (whether hazardous or not.) This
rule could trickle down to other
public agencies and to the private
sector, especially as liability
insurance coverage becomes more
limited, severely impacting our
rental market.

3) Equitable Life will no longer purchase
any property containing A.C.M.
Similar criteria by other instit-
utional investors will impact the
sales value of our properties.

4) Removal of A.C.M. is extremely expensive
and time consuming. Cahill Construction
cannot perform this work. The work
must be constantly inspected & is
performed with negative pressure
cells, separate entrances & exits
worker protection—showers, clothing
special air respirators, & periodic
health testing.

3.

5) As time passes, new & stronger standards and disposal regulations will be enacted — not only increasing any past liability but forcing us into more costly removal than we face at present.

Richard Cahill and I believe that we should commence formal air-testing and building inspection with an A.C.M. testing agency. Every effort would be taken to minimize the awareness of tenants and building personnel by use of vacant areas and assignment of only one person to accompany the inspector. However, some knowledge of the program by building personnel will occur due to the time required for testing (8 hrs per area) & access to certain areas i.e. fan plenums, boiler rooms etc.

The testing is a double-edged sword: a) it might indicate minimal, non-hazardous levels of contamination which would require minimal repairs;

we would also establish records
to protect us from 3rd party or
employee lawsuits, but

2) it might show contamination that
would force us to undertake
costly (containment & measures),
restructure our ownership structure,
and open the door to lawsuits.

Please give us your authorization to
proceed by Thursday, January 16, 1986. Any
recommendations regarding the program
would be welcomed. No selection of
a testing agency has been made. We
might want to have our attorney hire
the testing agent so as to establish
attorney-client privilege.

Jerry Cahill

Please return this memo or keep under
lock + key.